473 So.2d 237 (1985)
Florida Waterworks Association, et al., and Florida Home Builders Association, Appellants,
v.
FLORIDA PUBLIC SERVICE COMMISSION, Appellee.
Nos. AT-46, AT-47.
District Court of Appeal of Florida, First District.
July 15, 1985.
Rehearing Denied August 20, 1985.
*238 Ben E. Girtman, of Madigan, Parker, Gatlin, Swedmark & Skelding, and Stephen W. Metz, Tallahassee, for appellants.
Bill Bilenky, Gen. Counsel, Susan F. Clark, Deputy Gen. Counsel and Gregory J. Krasovsky, Associate Gen. Counsel, Florida Public Service Com'n, Tallahassee, for appellee.
*239 PER CURIAM.
Appellants appeal a hearing officer's final order upholding the validity of several proposed rules of the Public Service Commission relating to "contributions in aid of construction" (CIAC).[1] We affirm.
On July 20, 1982, the Commission issued an order containing its proposed rules regarding service availability policies and charges. One of them, proposed rule 25-30.58, provides as follows:
Guidelines for designing service availability policy.
(1) A utility's service availability policy shall be designed in accordance with the following guidelines:
(a) The maximum amount of contributions-in-aid-of construction, net of amortization, should not exceed 75% of the total original cost, net of accumulated depreciation, of the utility's facilities and plant when the facilities and plant are at their designed capacity; and
(b) The minimum amount of contributions-in-aid-of construction should not be less than the percentage of such facilities and plant that is represented by the water transmission and distribution and sewage collection systems.
(2) In any case where compliance with the guidelines of subsection (1) introduces unusual hardship or unreasonable difficulty, and the Commission, utility, or interested party shows that it is not in the best interests of the customers of the utility to require compliance, the Commission may exempt the utility from the guidelines.
Appellants challenge the validity of this and related rules on three grounds:
(1) The findings of the hearing officer upholding the validity of the rules are not supported by competent, substantial evidence;
(2) The Commission does not have statutory authority to adopt the rules; and
(3) These rules unconstitutionally confiscate a utility's property.
The Commission is given broad authority by section 367.101(1), Florida Statutes (1981), to set by rule "standards for service-availability charges and service-availability conditions." The Commission is also permitted by section 350.127(2), Florida Statutes (1981), to "adopt ... rules reasonably necessary to implement any law which it administers." The rules can be held invalid only if there is no competent, substantial evidence supporting the hearing officer's determination that the term "service-availability charges" is virtually synonymous with the term "contributions-in-aid-of construction" (CIAC).

I.
We must first determine the applicable standard of review of a hearing officer's order sustaining the validity of a proposed rule in a proceeding under section 120.54(4), Florida Statutes (1981). The following statements of the Florida Supreme Court, although applied to rulemaking proceedings under section 120.54(3), are in our judgment equally applicable to review of orders entered pursuant to section 120.54(4):
We adopt as the proper standard of review one set forth by the First District Court of Appeal upon review of similar rulemaking:
Where the empowering provision of a statute states simply than [sic] an agency may `make such rules and regulations as may be necessary to carry out the provisions of this Act,' the validity *240 of the regulations promulgated thereunder will be sustained as long as they are reasonably related to the purposes of the enabling legislation, and are not arbitrary or capricious.

Agrico Chemical Co. v. State, Department of Environmental Regulation, 365 So.2d 759 (Fla. 1st DCA 1978), cert. denied, 376 So.2d 74 (Fla. 1979); Florida Beverage Corp. v. Wynne, 306 So.2d 200 (Fla. 1st DCA 1975).
General Telephone Co. of Florida v. Florida Public Service Commission, 446 So.2d 1063, 1067 (Fla. 1984) (emphasis supplied). This test, approved by the Florida Supreme Court, was applied in Agrico to an order arising from a proceeding involving, as here, a challenge to a proposed rule. Thus, the standard of review for determining the validity of adopted rules, as well as orders entered in section 120.54(4) proceedings, is identical: The reviewing court should sustain both if they can be considered reasonably related to the purposes of the enabling legislation and are not arbitrary or capricious. The deference owed to a regulatory agency in its interpretation of statutes that it is authorized to administer has been otherwise stated as follows:
Agencies are afforded wide discretion in the interpretation of a statute which it administers and will not be overturned on appeal unless clearly erroneous. Pan American World Airways, Inc. v. Florida Public Service Commission and Florida Power & Light Company, 427 So.2d 716, 719 (Fla. 1983). The reviewing court will defer to any interpretation within the range of possible interpretation. Department of Health and Rehabilitative Services v. Wright, 439 So.2d 937 (Fla. 1st DCA 1983); Department of Administration v. Nelson, 424 So.2d 852 (Fla. 1st DCA 1982); State, Department of Health and Rehabilitative Services v. Framat Realty, Inc., 407 So.2d 238 (Fla. 1st DCA 1981).
Natelson v. Department of Insurance, 454 So.2d 31, 32 (Fla. 1st DCA 1984).

II.
We next determine if there is record support for the hearing officer's finding that the two terms in question, "CIAC" and "service availability charges," are synonymous. This finding depends simply on competent, substantial evidence, defined as "`such evidence as will establish a substantial basis of fact from which the fact at issue can reasonably be inferred [or] ... such relevant evidence as a reasonable mind would accept as adequate to support a conclusion.'" Duval Utility Co. v. Florida Public Service Commission, 380 So.2d 1028, 1031 (Fla. 1980) (quoting from De Groot v. Sheffield, 95 So.2d 912, 916 (Fla. 1957)). Although there may be technical distinctions between the two terms, we conclude there is ample support in the record for a finding that the industry has recognized both to be the same for all practical purposes.
One recognized means of ascertaining whether there is record support for a rule adopted by the Commission is whether the agency has developed in prior ratemaking proceedings policy which is consistent with that later provided by rule. This method of proof is exemplified by General Telephone Co. of Florida v. Florida Public Service Commission, 446 So.2d 1063 (Fla. 1984), in which one of the issues was whether the Commission could validly adopt a rule that reduced the income tax expense of a regulated utility in situations wherein the parent corporation of the subsidiary utility had invested in the equity of the subsidiary and both entities filed a consolidated income tax return. In upholding the validity of the rule against an attack that there was no record evidence supporting the rule, the court responded:
We find that the rule adopted by the PSC is neither arbitrary or capricious. The rule represents a valid implementation of a PSC policy choice regarding the treatment of a utility's income tax expense during ratemaking. Testimony put forth during the section 120.54(3) hearing shows that there is no single correct method of dealing with the income tax expense of a subsidiary-utility *241 joining in the filing of a consolidated return. By choosing this particular method, the PSC is merely acting within the scope of its discretion. It is clear that this Court will not substitute its judgment for that of the PSC on a discretionary decision. Citizens of Florida v. Mayo, 357 So.2d 731 (Fla. 1978). This particular policy choice finds ample support in the record, where it is shown that an income tax expense adjustment had been implemented in several past ratemaking cases in basically the same form as the rule now provides. In fact, this Court has instructed the PSC to apply this type of adjustment in a ratemaking case when the facts of the case were found to warrant such an adjustment. See Citizens of Florida v. Hawkins, 356 So.2d 254 (Fla. 1978). We therefore find that appellant's evidentiary challenges to the rulemaking are without merit.
446 So.2d at 1067 (emphasis supplied).
Additionally, facts recited in related opinions reflect that industry custom recognizes the similarity in the two terms:
These consolidated cases bring to us two orders of the Public Service Commission which condition the right of two utilities to receive service availability charges (commonly known as `connection charges,' or contributions in aid of construction) from their customers.
Duval Utility Co. v. Florida Public Service Commission, 380 So.2d at 1029. While the Duval Utility Co. case disapproved the Commission's order as lacking competent, substantial evidence, the opinion clearly did not disapprove the following statements from the Commission's order, disclosing the agency's policy of regarding service availability charges, for all practical effect, as CIAC:
We recognize that the customers (be it the developer who builds the service facility or the owner thereof), by payment to the utility of the service availability charges (CIAC) are `purchasing' water and sewer utility service availability. However, CIAC is a contribution to the utility's capital and is so recognized by both State and Federal law. (See 1976 Tax Reform Act, 90 Stat. 1912). So long as the initial utility that receives the CIAC provides the service, the customer receives the benefit of his contributions in the form of lower rates because CIAC is deducted from the company rate base.
Id. at 1029-30. It would appear from the above portion of the order that the Commission's incipient or developing policy at that time was to consider the two terms as practically identical.
The agency's progression of policy, first from "vague standards, then definite standards, then broad principles, then rules," McDonald v. Department of Banking and Finance, 346 So.2d 569, 580 (Fla. 1st DCA 1977), is one that is entirely consistent with Florida's Administrative Procedure Act. Moreover, the evidence supporting the foundation for the hearing officer's finding depended not only on long-standing agency policy, but also on conventional facts: A witness on behalf of Florida Waterworks Association admitted that service availability charges have basically the same effect as CIAC.
We reject, therefore, appellants' first point because the record contains competent, substantial evidence to show that these rules are not "arbitrary or capricious." Agrico Chemical Co. v. State, Department of Environmental Regulation, 365 So.2d 759. The Commission presented evidence, including expert testimony by qualified witnesses, that supports the findings of fact and conclusions of law of the hearing officer and shows the rational relationship of the rule to accomplishment of its various beneficial objectives, including preserving reasonable rates for utility services, preventing cash-flow crises resulting from insufficient income to cover expenses, creating incentive for the owners to efficiently and effectively manage the company, and properly allocating the risk of potential nondevelopment of new service areas. These facts clearly support the hearing officer's finding that the terms "contributions in aid of construction" and "service availability charges" are synonymous. See *242 Duval Utility Co. v. Florida Public Service Commission, 380 So.2d 1028.

III.
We next address appellants' second point, that the Commission lacks statutory authority for the proposed rules. Turning first to the Commission's proposed rule 25-30.515(3), the only distinction between the words in section 367.081(2), defining CIAC as including
any amount or item of money, services, or property received by a utility, from any person or governmental agency, any portion of which is provided at no cost to the utility, which represents a donation or contribution to the capital of the utility, and which is utilized to offset the acquisition, improvement, or construction costs of the utility property, facilities, or equipment used to provide utility services to the public...
(emphasis supplied), and the words in the proposed rule, is simply the insertion of the words "addition or transfer" instead of the statutory words, "donation or contribution." As stated by the hearing officer:
[I]t was the intention of the PSC to clarify the latter two words [`donation or contribution'] and not to change the statutory definition of CIAC. Inasmuch as the words `donate or contribute' have a connotation of being a gift or something voluntarily given to a charity, the words `addition or transfer' to the capital of a utility, when qualified by the prior words `at no cost to the utility' more clearly characterize CIAC. CIAC is given to obtain service. It is not necessarily voluntarily given.
We conclude that the evidence substantiates the above finding, and affirm the hearing officer's conclusion upholding the validity of proposed rule 25-30.515(3).
The Commission asserts that authority to adopt rule 25-30.58 is found in section 367.101(1), Florida Statutes (1981), which reads as follows:
Charges for service availability.
(1) The commission, by rule, may set standards for service-availability charges and service-availability conditions. Charges and conditions made by a utility shall be just and reasonable. The commission shall, upon request or upon its own motion, investigate agreements or proposals for charges and conditions to be made by a utility for service availability. The commission shall set just and reasonable charges and conditions for service availability.
We reject appellants' argument that this statute does not give the Commission authority to set specific maximum and minimum percentage limits on contributions in aid of construction. When read together, keeping in mind that "service availability charges" and "CIAC" are synonymous, the statutory phrases "standards for service availability charges and service availability conditions" and "just and reasonable charges and conditions for service availability" may reasonably be read as encompassing the setting of standards to regulate the use of CIAC for utility capitalization and rate-making purposes. The purpose of assigning a maximum level of CIAC to a regulated utility is based upon testimony that excessive amounts of CIAC could be detrimental to a utility's operation. There was evidence before the hearing officer from which she could properly conclude that if a utility is faced with an increase in operating and maintenance expenses, while being heavily financed by CIAC, it could find itself in a cash-flow crisis with no income to cover increased expenses. Moreover, the opinion testimony disclosed that owners operating utilities with high levels of CIAC and low levels of owner investment could lose their commitment to continue maintenance of the utilities in a cost-efficient manner. Obviously, such cash-flow difficulties could affect the utility's ability to provide adequate service and result in abandonment of the plant. Two small utilities in fact may have been abandoned because of high levels of CIAC.
Since there is competent, substantial evidence supporting the determination that service availability charges and CIAC are synonymous, the Commission's power to *243 set standards for CIAC is clearly delegated to it by section 367.101(1) as a proper exercise of its police powers. Under the same theory as applied to 25-30.58, there is nothing wrong with proposed rule 25-30.57 permitting the Commission to impute the maximum level of CIAC to no more than seventy-five percent in those situations where the actual amount of CIAC has not been recorded on the utility's books and the utility fails to submit competent, substantial evidence of the actual amount of CIAC it has received. Since the proposed rules setting a minimum and maximum percentage of CIAC that a utility may have in its capital structure fall well within the scope of the statutory authority, appellants' second argument is without merit.

IV.
Appellants' final point, that the proposed rules unconstitutionally confiscate a utility's property, is also lacking in merit because the proposed rules do not impair a utility's rate of return on the owner's invested capital. The rules merely regulate the extent of the owner's invested capital and are intended to assure that every utility has a sound capital structure capable of withstanding unexpected fluctuations in operating expenses and providing owner-incentive in proper management of the utility. The cases cited by appellants to support their argument are distinguishable because they involve confiscation based on the allowance of an improperly low rate of return.
Proposed rule 25-30.57 generally provides that the Commission may impute a level of CIAC equal to the required minimum level under rule 25-30.58 if a utility cannot prove its actual amount of CIAC by competent, substantial evidence. This rule is not unconstitutionally confiscatory because CIAC will be imputed under the rule only if a utility has failed to properly maintain records of CIAC. Water and sewer utilities regulated by the PSC are uniformly required to keep records complying with a uniform system of accounts; therefore, as found by the hearing officer, nearly all utilities have records which establish their rate base. Since CIAC must be excluded from the rate base in any rate proceeding (section 367.081(2)), and a regulated utility is required to substantiate the amount it claims as a rate base upon which it is entitled to earn a fair rate of return, we agree entirely with the hearing officer's conclusion that "the imputation rule is simply a rule of practice which sets forth the PSC's method of determining a utility's CIAC amount when that utility has failed to maintain required records." Furthermore, it is not arbitrary or capricious to assume that a utility will comply with the rules by maintaining at least the required minimum level of CIAC. The burden is placed on the utility to prove the actual amount of CIAC; otherwise, the Commission may justifiably assume that the utility is in compliance with the rules, unless the Commission has excused such compliance under the hardship exception set forth in subsection (2). This rule, like rule 25-30.58, is a proper exercise of legislatively delegated authority pursuant to section 367.101(1), Florida Statutes (1981).
Appellants further argue that the Commission may misapply this rule to confiscate property in situations where a utility can prove its level of CIAC but such level is not in compliance with rule 25-30.58. If the Commission does indeed misapply this rule, then such misapplication should be challenged at that time.
The dissent refers to Aloha Utilities, Inc. v. Florida Public Service Commission, 376 So.2d 850, 851 (Fla. 1979), to support the proposition that denial of a justified rate increase is not a sanction that the Commission is authorized to impose as a result of a utility's faulty record keeping. But the above proposition is not applicable here. The instant case does not involve an application for a rate increase, as in Aloha, but rather pertains to the validity of a rule which may be used, at some time in the future, to impute a certain level of CIAC to a particular utility. In any event, the Supreme Court in Aloha recognized that "[s]anctions for record-keeping noncompliance *244 may take a variety of lawful forms" other than the denial of a rate increase. Id. at 851 (emphasis supplied). The imputation of CIAC to a utility that has failed to keep proper records is but one of a variety of lawful sanctions available to the Commission in carrying out its statutory responsibilities to fix rates "which are just, reasonable, compensatory and not unfairly discriminatory." § 367.081(2), Fla. Stat. (1981).
The argument raised against the proposed imputation rule as a means of denying a utility a justified rate increase is somewhat similar to the argument raised by certain counties in Polk County v. Florida Public Service Commission, 460 So.2d 370 (Fla. 1984), challenging the validity of Florida Administrative Code Rule 25-9.525, permitting a municipal electric utility to impose a surcharge on customers living outside its corporate limits equal to the service tax imposed on customers within the corporate limits. In answer to the counties' contention that the rule represented an invalid attempt by the Commission to regulate the dollar amounts charged by municipal utilities, the court responded that the rule acted to regulate "rate structure"  not rates  an activity which was properly within the Commission's power, since "`[r]ate structure refers to the classification system used in justifying different rates.'" Id. at 372 (quoting from City of Tallahassee v. Mann, 411 So.2d 162, 163 (Fla. 1981)). Similarly, in the case at bar, the imputation rule is not a sanction for denying a proper rate increase, but is simply a means of determining the rate which a utility should reasonably charge if it fails to establish the justification for its charge due to faulty record keeping.
It should further be realized that under proposed rule 25-30.51, the challenged rules would become applicable only when a utility files for a change in its service availability policy or charges, or when the Commission initiates a show cause proceeding to require the utility to change such policy or charges. Therefore, the imputation rule would ordinarily be applicable at the time the regulated utility applied for a rate increase and would have no effect on rates previously established before the effective date of the rule.
Additionally, the rules themselves provide for a waiver from imputation and an exemption for the guidelines in cases of undue hardship or unreasonable difficulty, or when the application of the rules would not be in the best interest of the customer. Thus, as stated by the hearing officer, the "inclusion of waiver and exemption provisions in the proposed rules is evidence that the PSC recognizes that the guidelines and imputation rules may not be arbitrarily applied to all regulated utilities." The Commission's exercise of discretion in permitting a waiver or exemption from the operation of its rules in similar cases has been recognized as an adequate safeguard against arbitrary or capricious agency action:
[T]he utility could, upon a proper showing, convince the PSC to waive or deviate from the rule simply on the basis of an exercise of PSC discretion, and such deviation would be proper as long as adequately explained. See § 120.68(12)(b), Fla. Stat. (1981); E.M. Watkins & Co. v. Board of Regents, 414 So.2d 583, 588 (Fla. 1st DCA 1982), review denied, 421 So.2d 67 (Fla. 1982). We find these various safeguards are sufficient to ensure that the utility will have its income tax expense figure properly calculated in all instances, and we therefore dismiss appellants' due process arguments.
General Telephone Co. of Florida v. Florida Public Service Commission, 446 So.2d at 1070.

V.
Consistent with appellants' argument, the only basis for the rules the dissent would find acceptable is specific statutory language conferring authority on the Commission to control a regulated utility's levels of CIAC as a means of determining a fair rate. This premise would be stronger if the water utilities before us were not subject to the police powers of the state. *245 Section 367.011(3), Florida Statutes, explicitly states:
The regulation of [water and sewer] utilities is declared to be in the public interest, and this law is an exercise of the police power of the state for the protection of the public health, safety, and welfare. The provisions of this chapter shall be liberally construed for the accomplishment of this purpose.
(Emphasis supplied.)
Two generally recognized exceptions to the general rule that the legislature should provide certain legislative guidelines when delegating discretion to an agency to act are (1) when the subject of the statute relates to licensing and the determination of the fitness of the applicant to be licensed, and (2) when the statute regulates businesses operated as a privilege rather than as a right which are potentially dangerous to the public. Permenter v. Younan, 159 Fla. 226, 31 So.2d 387, 389 (1947); Solimena v. State, Department of Business Regulation, 402 So.2d 1240 (Fla. 3d DCA 1981), review denied, 412 So.2d 470 (Fla. 1982); Astral Liquors, Inc. v. State, Department of Business Regulation, 432 So.2d 93 (Fla.3d DCA 1983), aff'd, 463 So.2d 1130 (Fla. 1985); Brewer v. Insurance Commissioner and Treasurer, 392 So.2d 593 (Fla.1st DCA 1981). As we observed in Brewer, there is a distinction between the legislature's delegating to an agency "the power to say what the law is" and its delegating to the agency "some discretion in the operation and enforcement of the law." 392 So.2d at 595 (emphasis supplied).
In situations in which it is impracticable for the legislature to provide definite, comprehensive standards, the standard of reasonableness will be applied:
`The general rule, which requires an express standard to guide the exercise of discretion is also subject to the exception that where it is impracticable to lay down a definite comprehensive rule, such as where regulation turns upon the question of personal fitness, or where the act relates to the administration of a police regulation and is necessary to protect the general welfare, morals, and safety of the public, it is not essential that a specific prescribed standard be expressly stated in the legislation. In such situations the courts will infer that the standard of reasonableness is to be applied.'
North Broward Hospital District v. Mizell, 148 So.2d 1, 4, n. 11 (Fla. 1962) (quoting 1 Am.Jur.2d, Administrative Law, Section 116).
The reasonableness standard of review over agencies charged with enforcing statutes enacted under the police powers was recently reiterated by the Florida Supreme Court in Astral Liquors, Inc. v. Department of Business Regulation, 463 So.2d 1130, 1132 (Fla. 1985), recognizing, under such circumstances, that "the legislature is not required to provide specific rules to cover all conceivable situations that may confront the agency."
The Florida Supreme Court has not as yet abrogated the nondelegation doctrine. See Askew v. Cross Key Waterways, 372 So.2d 913 (Fla. 1979); Orr v. Trask, 464 So.2d 131 (Fla. 1985). It has in general rejected the thesis advocated by Professor Davis that "when legislative bodies have failed to provide standards, the court should not hold the delegation unlawful but should require that the administrators must as rapidly as feasible supply the standards." 1 K. Davis, Administrative Law Treatise, § 315 at 207 (2d ed. 1978). Under Davis's theory, the test for determining the validity of the agency action under review should be "administrative safeguards and standards, not statutory safeguards and standards." Id. at 211. The basis for the court's refusal to accept Professor Davis's approach is that Article II, Section 3, Florida Constitution, forbids one branch from exercising any powers pertaining to either of the other branches unless otherwise provided in the constitution. 372 So.2d at 924-25. Neither Cross Key nor Orr, however, expressly repudiates the long line of cases recognizing that when a general power is conferred on the executive branch pursuant to the state's inherent police powers, the *246 power delegated need only be generally conferred.
The proper balance between the separation of power and the police powers doctrine was observed in State v. Bender, 382 So.2d 697 (Fla. 1980), which upheld against constitutional attack sections 322.261 and 322.262, Florida Statutes (1977), authorizing the Department of Highway Safety and Motor Vehicles and HRS to establish and approve appropriate testing methods for determining alcoholic content in the blood:
The legislature merely assigned to the agencies the responsibility to establish proper uniform testing procedures for the protection of the public who must submit to the test or lose their driving privilege. There is a clear distinction between delegating to an executive agency law-making functions and assigning an executive agency supervisory responsibility over a police power function that already exists. To require legislative supervision of the administration of these scientific testing methods would require constant legislative hearings to develop the necessary expertise, which is neither practically possible nor required by our constitution. See State, Department of Citrus v. Griffin, 239 So.2d 577 (Fla. 1970). We find the legislature properly exercised its authority in assigning to these agencies the responsibility of establishing uniform and reliable testing methods in this scientific area, particularly under the circumstances where the tests are part of a statutory scheme which prescribes the implied consent of all drivers to take these tests and where the tests and procedures are always subject to judicial scrutiny.
382 So.2d at 700 (emphasis supplied). Davis's argument advocating the abandonment of the nondelegation doctrine would therefore appear to be appropriate as to legislation adopted pursuant to the inherent police powers of the state for the protection of the public. See Astral Liquors, Inc. v. State, Department of Business Regulation, 432 So.2d at 95: "The doctrine of nondelegation does not preclude all agency discretion."
As to the two recognized exceptions to the general rule of nondelegation, it can hardly reasonably be argued that within the broad contours of the regulatory statutes under review the legislature has not delegated "sufficient standards or guidelines to enable the agency and the courts to determine whether the agency is carrying out the legislature's intent." Department of Insurance v. Southeast Volusia Hospital District, 438 So.2d 815, 819 (Fla. 1983).
Having considered the expressed legislative intent behind the regulations to protect "the public health, safety and welfare," we need consider only whether the rules "are reasonably related to the purposes of the enabling legislation, and are not arbitrary or capricious." General Telephone Co. of Florida v. Florida Public Service Commission, 446 So.2d at 1067 (quoting Agrico Chemical Co. v. State, Department of Environmental Regulation, 365 So.2d 759 (Fla.1st DCA 1978). The rules or regulations in question can hardly be considered on their face as capricious or arbitrary. If they should prove to be so in their application, adequate safeguards exist to protect aggrieved persons from the agency's arbitrary actions. As stated in State v. Department of Industry, Labor and Human Relations, 77 Wis.2d 126, 252 N.W.2d 353, 357 (Wis. 1977): "[B]road grants of legislative powers will be permitted where there are procedural and judicial safeguards against arbitrary, unreasonable or oppressive conduct of the agency."
The Administrative Procedure Act affords many remedies to persons substantially affected by an agency's arbitrary exercise of power. If a person so affected cannot prevail at an administrative hearing, section 120.68, Florida Statutes, provides an avenue of judicial appellate review. Appellants may yet have the opportunity to demonstrate that the policy decisions of the Commission in their application  not as adopted  are arbitrary and capricious.

*247 VI.
Finally, appellants urge that the economic impact statement (EIS) issued by the Commission fails to comply with the statutory requirements of section 120.54(2)(a), Florida Statutes (1981). The hearing officer specially found that the EIS adequately complies with that statute, and we find that the hearing officer's determination is supported by competent, substantial evidence. The EIS adequately addresses all the areas required by statute to be addressed and adequately fulfills its purpose even though the conclusions therein are subject to debate. Moreover, even if appellants' argument had merit, they have failed to prove that the fairness of the proceedings or the correctness of the action was impaired by any of the alleged deficiencies. Polk v. School Board of Polk County, 373 So.2d 960 (Fla.2d DCA 1979).
We have considered the remaining arguments made by appellants and find them to be without merit.
AFFIRMED.
ERVIN and ZEHMER, JJ., concur.
BOOTH, C.J., dissents.
BOOTH, Chief Judge, dissenting:
I dissent from the majority view as to the validity of proposed Rules 25-30.57 and 25-30.58. These rules, which allow the Commission to set levels of contributions-in-aid-of-construction (CIAC) and to impute a level of CIAC equal to the required minimum level, are beyond the scope of statutory authority afforded to the Commission.[1]
I would also hold invalid Rule 25-30.515(3), which proposes to substitute the words "addition or transfer" for the words "contribution or donation," found in the statutory definition of CIAC in Section 367.081(2), Florida Statutes. The hearing officer's determination that this change in the wording "merely clarified the statutory definition" and that "the meaning of the term CIAC has not been changed by this rewording," should be reversed.
The statute relied on by the Commission as empowering it to adopt these rules is Section 367.101(1), which provides:[2]
The commission, by rule, may set standards for service-availability charges and service-availability conditions. Charges and conditions made by a utility shall be just and reasonable. The Commission shall, upon request or upon its own motion, investigate agreements or proposals for charges and conditions to be made by a utility for service availability. The commission shall set just and reasonable charges and conditions for service availability.
The above-quoted statute: (1) makes no mention whatever of CIAC, and (2) gives no authority to set maximum/minimum levels of, or to impute levels of, charges or of CIAC. The statute quite plainly empowers the Commission to set just and reasonable charges and conditions for service availability.
The hearing officer, nonetheless, reasoned that, although the term "service availability charges," rather than "CIAC" is used in the above-quoted statute, those terms are "virtually synonymous,"[3] and on that tenuous basis upheld the validity of the rules regulating maximum/minimum levels of CIAC.
The hearing officer then took the next step and upheld the power of the Commission to impute a level of CIAC, a potentially confiscatory measure. Side-stepping this issue, the hearing officer found that as long as petitioners maintained proper records, the imputation rule would not be applied to them. By that reasoning, the *248 imputation of CIAC and its corresponding affect on rates is to be used by the Commission as a sanction for non-compliance with record keeping, contrary to Aloha Utilities v. Florida Public Service Commission, 376 So.2d 850, 851 (Fla. 1979), wherein the Supreme Court held that the Commission could not deny a justified rate increase as a sanction for non-compliance with record-keeping requirements, holding:
In this case, the Commission has endeavored to sanction or punish Aloha for non-compliance with the Commission's regulations by denying an otherwise proven rate award. This, too, constitutes a departure from essential requirements of law. Sanctions for record-keeping non-compliance may take a variety of lawful forms, but denial of a justified rate increase is not one of them.
The Commission is proposing by these rules to enter new areas of regulation but has failed to show the power asserted is granted by the Legislature. In City of Cape Coral v. GAC Utilities, Inc., of Florida, 281 So.2d 493 (Fla. 1973), the Supreme Court held:
Any reasonable doubt as to the lawful existence of a particular power that is being exercised by the Commission must be resolved against the exercise thereof, [citations omitted] and the further exercise of the power should be arrested, [citations omitted]. The Legislature of Florida has never conferred upon the Public Service Commission any general authority to regulate public utilities.
The Public Service Commission has only those powers granted it by statute expressly or by necessary implication. Deltona Corporation v. Mayo, 342 So.2d 510 (Fla. 1977).
A plain reading of the statutes, Chapter 367, Florida Statutes, and the rules of the Commission show that the terms "CIAC" and "service-availability charges" are not used interchangeably or as synonyms either by the Legislature or by the Commission.[4] The two terms express different concepts, one relating to the regulation of charges and conditions for the initiation of service[5] and the other having to do with the utility's capital structure, and, through Section 367.081, with rates for service.[6] Although both terms may eventually or inevitably apply to the same money or asset,[7] the power to regulate one has not *249 heretofore been taken to allow regulation of the other as proposed here.
Had the Legislature intended that the Commission regulate CIAC beyond the regulation allowed in, for example, Section 367.081, Florida Statutes, it would have been a simple matter to so empower the Commission. This was not done, and we should not allow the plain meaning of the statute on charges for service-availability to be distorted in order to facilitate a "bootstrapping" operation by the Commission. As most recently stated by this Court in St. Joe Paper Company v. Department of Revenue, 460 So.2d 399, 402 (Fla.1st DCA, 1984):
The Department's interpretation would require the court to add the word "amended" to Section 214.14, and it is axiomatic that the court is not free to add words to steer a statute to a meaning which its plain wording does not supply. (citations omitted)
This Court will not concern itself with the wisdom of the proposed rules[8] nor with the dire consequences of the rules predicted by appellant here. However, rules which are beyond the power conferred on the agency by the Legislature should be stricken.
I respectfully dissent.
NOTES
[1] In the administrative proceeding below, appellants challenged the validity of the following proposed rules:

1. Rule 25-30.51 (applicability of the rules).
2. Rule 25-30.57 (imputation of CIAC).
3. Rule 25-30.58 (minimum and maximum levels of CIAC).
4. Rule 25-30.585 (developer service availability charges).
5. Rule 25-30.515(3) (definition of CIAC).
6. Rule 25-30.54(4) (performance under agreements).
7. Rules 25-30.53 and 25-30.545 (collection of expenses and recovery of costs).
Appellants also challenged the repeal of rules 25-10.120 through 25-10.144.
[1] Other proposed rules, to the extent dependent on these rules, should also be stricken.
[2] Also cited as authority is Section 367.121(1), Florida Statutes, which sets out the general powers of the Commission.
[3] Order of the hearing officer: "CIAC is virtually synonymous with service-availability charges. The collection of such a charge, or property in lieu of the charge, is the collection of CIAC. When a charge is collected or property accepted, the level of CIAC for the utility is affected."
[4] See, e.g., proposed Rule 25-30.565, wherein the Commission uses both terms, viz: paragraph (2)(k), requires information of the company's "present structure including contributions-in-aid-of-construction previously received" (emphasis added); paragraph (4) of the same rule, requires "[e]ach utility shall justify the service-availability charges and conditions by competent, substantial evidence." (emphasis added). The agency itself does not treat these terms as synonymous, and it should not seek an interpretation of its empowering legislation contrary to its own proven usage of the terms. Whether service-availability charges are "commonly known as `connection charges' or contributions-in-aid-of-construction" is not a factor supporting the agency's position here. Duval Utility Company v. Florida Public Service Commission, 380 So.2d 1028, 1029 (Fla. 1980).
[5] H. Miller & Sons, Inc. v. Hawkins, 373 So.2d 913, 916 (Fla. 1979):

The crucial time in regard to service-availability charges must be the date of connection since there can be no ascertainment of the actual cost of maintaining sufficient capacity until that date. Just as rates offset the cost of service and are determined by past costs, so do service-availability charges offset the costs of preserving plant capacity and are determined by past costs. The Commission must have the ability to alter service-availability charges to defray the expenses of preserving plant capacity with changing economic factors: otherwise the whole point of having service-availability charges would be lost and existing customers would subsidize future connections.
[6] Section 367.081(2), Florida Statutes:

[T]he Commission shall not allow the inclusion of contributions-in-aid-of-construction in the rate base of any utility during a rate proceeding; and accumulated depreciation on such contributions-in-aid-of-construction shall not be used to reduce the rate base, nor shall depreciation on such contributed assets be considered a cost of providing utility service.
[7] Christian and Missionary Alliance v. Florida Cities, 386 So.2d 543, 545 (Fla. 1980):

The private water utility is required to record all connection charges in account number 271 (Uniform System of Accounts) as contributions-in-aid-of-construction which are thereafter deducted from the utility's investment for rate-making purposes. Consequently, the collection of service-availability charges by a private utility has the effect of reducing, or at least controlling, rates to customers. Thus, the objective expressed in the Commission's order: "that the new customer will bear the expense of expansion of the facilities to provide him service in order that such new customer will not be subsidized by existing customers," is met.
[8] Public Service Commission Economic Impact Statement, Exhibit 3 at Record page 55:

There are certain long run economic impacts of requiring companies to accept CIAC. Under rate-of-return-on-rate-base regulation, a company generally may profit only through a return on equity investment. Without prospective profits, entrepreneurs will not enter an industry. For the water and sewer industry, profits also may be earned through eventual sale to a municipality or through a complementary associated industry such as real estate development. If CIAC is required and companies are not permitted enough profit (e.g. through a higher return on equity or through a fee for managing CIAC plant), then investors will not have an incentive to enter the water and sewer industry as a long run endeavor. The only companies in the industry will be those expecting profits from some source other than the continuing operation of the company. (emphasis theirs)
If it is anticipated that government ownership of these companies will ultimately prevail, then individual customers are likely to benefit through lower rates in the long run. They have lower rates in the short run because of CIAC, and in the long run because of subsidies available to government entities but not to private investors.