ERVIN, Judge.
Appellant, Sunshine Utilities of Central Florida, Inc., seeks review of a final order of the Florida Public Service Commission (PSC or Commission), approving appellant’s application for a rate increase, but at a rate less than that requested. Appellant specifically challenges certain reductions to its rate base, including a deduction of $280,753 which was imputed to contributions-in-aid-of-eonstruction (CIAC); deletions for disallowance of markup and profit on construction of plants for appellant by a related company, Water Utilities, Inc. (WUI), from 1983 to 1990; a decrease in the president’s proposed salary from $69,055 to $43,372; and a disallowance for an increased allocation of employee salaries to a related utility, Heights Water Company (Heights). We affirm in part, and reverse and remand in part.
Sunshine is a “Class B” water utility company which operates more than 20 separate water plants and serves customers in Marion County. The company is wholly owned by James Hodges, Jr., and his wife, Clarise. They also own Heights, a water utility operating two plants in Citrus County, and WUI, a construction company that builds water plants and distribution systems solely for Sunshine. Before May 5, 1981, the date the PSC assumed jurisdiction over Marion County water utilities, the Hodges operated the water systems under separate names, all of which were regulated by Marion County. In September 1981, the Hodges applied for certification of the water systems with the PSC.
In attempting to determine the utility’s initial rate base, the PSC found Sunshine’s records to be incomplete, and the PSC staff *308 decided to ascertain the base by conducting an “original cost study,” a procedure the PSC customarily employs whenever it is necessary to establish the initial rates for a utility that has maintained incomplete or inadequate records. In performing its study, the PSC staff audits the available records, and, in situations wherein specific proof pf investment is nonexistent, it uses adjusted estimates of plant values in order to fix the rate base, including the owner’s capital investment (equity or debt) and CIAC. The PSC’s study culminated in the issuance of Order No. 13014 on February 20,1984, setting the original rate base at $322,924. This figure was arrived at in part by appraising the total value of Sunshine’s facilities as of December 31, 1982 in the amount of $615,858, a sum $280,753 more than the amount reflected in the company’s records ($335,105).
In reviewing Sunshine’s 1987 annual report, the PSC staff later discovered an error in Order No. 13014 in regard to the $280,753 difference between book and PSC value of the facilities. The error was apparently uncovered when Sunshine changed accountants, and the new accountant reported the $280,-753 difference in a manner different from previous reports. As the utility had failed to prove any investment in the $280,753 figure during the original cost study, the staff concluded that it was CIAC, and that this amount had been erroneously omitted from CIAC in the PSC’s original cost study order. See Sunshine Utils. v. Florida Pub. Serv. Comm’n, 577 So.2d 663, 664-65 & nn. 2 & 3 (Fla. 1st DCA 1991) (Sunshine I).
As a result of the above error, the Commission initiated an overearnings investigation on August 30, 1988. That investigation culminated in Order No". 22969, issued on May 23,1990, which found overearnings from August 30, 1988 through December 31, 1989, and required Sunshine to refund those over-earnings. Id. In so ordering, the PSC adopted the staffs position regarding the $280,753 CIAC adjustment error. The PSC decided that Sunshine had the burden of proving actual investment (equity or debt) in the $280,753 amount, and that Sunshine had failed to meet its burden, both during the original cost study and the overearnings proceeding. Id. at 665 n. 3. This court affirmed the above order on appeal, and the supreme court denied certiorari review. Sunshine I; Sunshine Utils. v. Public Serv. Comm’n, 589 So.2d 293 (Fla.1991).
While the overearnings/refund appeal was pending, Sunshine filed an application for a rate increase on October 1, 1990. In Order No. 24484, filed on May 7, 1991, the PSC gave notice of its proposed action, namely, that it would grant an increase, but in an amount less than that requested. In reaching its preliminary decision, the PSC indicated that the following items would be excluded from rate base: $280,753 in adjusted CIAC; profit and markup paid to WUI on plant additions; a reduction in the requested president’s salary; and a reduction for the expense of employee salaries, because Sunshine’s employees were shared with the related utility, Heights. Following an administrative hearing, the PSC issued Order No. 25722, adopting the recommended reductions, which is the subject of the current appeal. We address separately each of the points raised.
A. Deduction for $280,753 in Imputed CIAC.
The Commission determined in the rate-increase case that the utility had again been unsuccessful in attempting to establish investment in the $280,753 figure, and therefore classified the sum as CIAC, causing it to be deducted from rate base.[1] We conclude *309 that there is competent, substantial evidence (CSE) in the record to support the PSC’s determination and therefore affirm on this point. PSC witness Willis testified that the Commission had erred in its original cost study by not designating the $280,753 difference between the determined value and book value of the plants as CIAC. It was, moreover, the utility’s burden to prove investment in that sum, or the PSC could impute it as CIAC. Because the utility was unable to prove investment due to the condition of its books and records, the PSC imputed the sum as CIAC in the earlier overearnings case. Willis testified that the utility had presented nothing dining the later rate-increase case which should cause the Commission to change its imputation of that amount to CIAC.
As it had done in the prior proceeding, Sunshine presented checks and invoices for expenses, but, as Willis explained, these documents only proved the original value of the plant; they did not show the source from which the funds were received to pay the invoices and checks. As for the tax returns Mr. Hodges submitted, Willis reviewed them and stated that he did not know whether they had included CIAC. Nothing in the returns indicated that CIAC had been considered, and Sunshine’s accountant, Robert Nixon, presented no underlying documents to show the contrary. Admittedly, utility witness Nixon gave conflicting testimony, but it was the PSC’s prerogative to evaluate the conflicting evidence and assign whatever weight it deemed necessary. United Tel. Co. v. Mayo, 345 So.2d 648 (Fla.1977); Gulf Power Co. v. Florida Pub. Serv. Comm’n, 453 So.2d 799 (Fla.1984).
We reject appellant’s arguments regarding the impossibility of its burden, the imposition of a penalty for not complying with PSC record-keeping requirements, and the retroactive application of a new CIAC standard. When a utility falls within PSC’s jurisdiction, an original rate base must be set. The law clearly establishes that the utility has the burden of proving its investment. Florida Waterworks Ass’n v. Florida Pub. Serv. Comm’n, 473 So.2d 237, 243 (Fla. 1st DCA 1985) (burden is on utility to prove CIAC), review denied, 486 So.2d 596 (Fla.1986). Here, CIAC was imputed not as a sanction for the utility’s failure to maintain records in accordance with PSC standards, but simply because Sunshine was unable to prove its investment. Thus, the substantial obstacle which Sunshine encountered in seeking to satisfy its burden was the result of its own inadequate record keeping. Finally, because this is a new proceeding which was commenced by the filing of Sunshine’s application for a rate increase, effective October 1, 1990, the application of CIAC standards existing at that time cannot be said to be retroactive.
B. Deduction of Markup and Profit Paid to WUI.
In its final order, the PSC found that the $206,790 paid to WUI for markup and profit on construction of plant additions from 1988 through 1990 was unreasonable, and reduced the utility’s rate base by such amount. In addition, the PSC similarly concluded that $187,379 should be deducted from the utility’s rate base for markup and profit paid to WUI during the years 1983-87. These deductions were supported by findings that WUI was not a legitimate, separate business.
As for the deduction for payments made to WUI during 1988-90, there is CSE to support the Commission’s action. PSC witness Forbes testified that Sunshine’s books could not readily support plant additions. His review of the audit showed that WUI built the bulk of the plant and distribution system additions. WUI added overhead markup and profit markup to material costs, and added as well an allowance for labor charges. These costs were calculated by taking the cost of materials, plus 20 percent markup for overhead, and increasing the amount by 20 percent for profit. The labor allowance was calculated based on how many linear feet of water line were installed. Forbes considered this procedure suspect for several reasons. First, WUI uses Sunshine *310 employees to perform the construction without paying salaries. Second, WUI does not perform construction for any other entities; Sunshine is its only customer. WUI reports no officers’ salaries, rents, interest expense, employee benefits, or miscellaneous expenses. It paid no taxes or insurance in 1988 or 1990. In having no salaries, overhead, or any substantial depreciable assets, WUI obviously does not operate in a manner similar to a full-time construction company. Forbes testified that it appears that WUI does not do anything for Sunshine that Sunshine could not do for itself, and that it was questionable whether Sunshine could justify the overstated amounts included on plant additions. He therefore concluded that there appeared to be no reason for Sunshine to engage in operations with WUI except to provide the owner with a profit, and that the Commission should consider deducting $206,790 in plant-in-service for the period 1988-90.
Although there is evidence in the record which conflicts with the above evidence, namely, the testimony from utility witnesses Hodges, Schneider, and Nixon, who all stated that the costs were reasonable and that the use of WUI saved Sunshine substantial expense, as well as evidence from after-the-fact bids received from outside contractors, the PSC has the prerogative to evaluate conflicting testimony and accord it whatever weight it deems appropriate. Mayo, Gulf Power Co. Based upon the foregoing evidence, the order is affirmed as to the deduction for this period.
In regard to the PSC’s deduction of $187,379 from Sunshine’s rate base due to markup and profit paid to WUI during the years 1983-87, we reverse. Although there was evidence before the Commission from which it could lawfully conclude, as it had for the years 1988-90, that WUI was not a legitimate, separate business, we consider that the PSC is bound by the stipulation it made during the earlier 1988 over earnings case in regard to the period from 1983-87. There the Commission agreed that “[n]o adjustment is necessary to reflect the original cost of plant additions booked from 1983 to 1987. Based upon the information submitted by the Utility, the amount of plant additions booked during that time appear reasonable.”
The only reason the PSC offered to disregard the parties’ stipulation was Wilks’s statement that the issue had not been fully explored during the overearnings case, because staff believed WUI was a legitimate construction company which performed construction for other companies besides Sunshine. The general rule is that a party will be relieved from a stipulation entered into under a mistake as to a material fact, if there has been reasonable diligence exercised to ascertain such fact. On the other hand, if a party enters into an agreement, not as a result of a mistake of fact, but merely due to a lack of fall knowledge of the facts, caused by the party’s failure to exercise due diligence to ascertain them, there is no proper ground for relief. See Fawaz v. Florida Polymers, 622 So.2d 492, 495 (Fla. 1st DCA 1993).
In the ease at bar, we find no basis to relieve the Commission of its stipulation based upon its mistake, because we conclude that the Commission failed to exercise due diligence prior to entering into the stipulation. In 1981, the PSC staff initiated an original cost study to determine Sunshine’s initial rate base, which took two years. The overearnings investigation launched on August 30,1988, culminated in the PSC’s imputation of $280,753 to CIAC. The Commission had ample time during the above investigations to ascertain whether WUI was a legitimate construction company. Yet it did not, and we consider that its failure to do so is attributable to lack of due diligence in ascertaining the true extent of WUI’s operations. We therefore conclude that the PSC must be bound by its stipulation that the cost of plant additions for the 1983-87 period was reasonable; consequently, we reverse the Commission’s deduction of $187,379 for that period.
C. Reduction of Requested Salary for President.
In its final order, the PSC rejected Sunshine’s proposed $69,055 salary for its president, approving a salary of $43,372 instead. In so doing, the Commission found that the utility had failed to present any *311 evidence supporting the substantial increase in salary, nor had Sunshine established that the president’s duties had so expanded as to justify the requested addition.
The Commission’s decision is based on PSC witness Willis’s testimony, who stated that the president’s salary had increased dramatically, from $41,704 to $64,386, for the years 1989-90, revealing a 54.38 percent increase.[2] Moreover, the proposed salary of $69,055 displayed a 65.58 increase from 1989. He stated that no reason had been given for such a substantial amount. In considering the reasonableness of the proposed salary, Willis compiled a study of various presidents of other utilities in the area, which showed the average president’s salary to be $35,396. He asserted that the average was not comparable to the proposed salary at bar, thus “competitive salaries” could not be used to justify the increase. He consequently recommended a five percent increase of the 1989 salary from $41,704 to $43,474.
We do not consider the above testimony to constitute CSE to reduce the proposed salary. Willis’s calculation of the president’s salary for 1989 is flawed, because he did not consider that portion of Hodges’ 1989 income derived from draws taken prior to Sunshine’s incorporation; yet, Hodges’ income in 1989 was, in fact, derived in part from a draw and in part from salary. There was also a flaw in Willis’s comparison of Hodges’ salary with the salaries of other presidents. In determining whether an executive’s salary is reasonable compared to salaries paid to other company executives, the comparison must, at the minimum, be based on a showing of similar duties, activities, and responsibilities in the person receiving the salary. Metropolitan Dade County Water & Sewer Bd. v. Community Utils. Corp., 200 So.2d 831, 833 (Fla. 3d DCA 1967). There is no discussion regarding the duties and responsibilities of the other executives contained on Willis’s comparison list. Moreover, Willis admitted that some of the executives included on his comparison list do not work full time, as does Hodges, and that he did not account for this in his comparison. Nixon and Hodges each testified that many of the presidents listed do not work full time, and that many of the itemized utilities are not comparable in size to Sunshine. In fact, Hodges testified that only Marion Utilities, which operates 24 plants, was comparable to Sunshine, which operates 23 plants in Marion County, and it paid its president $67,334. The largest number of plants any of the remaining utilities had was six.
In conclusion, we reverse on this point because the reduction in the president’s salary is not supported by CSE. See, e.g., Florida Crown Util. Servs., Inc. v. Utility Reg. Bd. of City of Jacksonville, 274 So.2d 597 (Fla. 1st DCA 1973) (error to reduce management fee from $12,500 to $5,400); Westwood Lake, Inc. v. Metropolitan Dade County Water & Sewer Bd., 203 So.2d 363 (Fla. 3d DCA 1967) (no CSE to support order reducing salaries of utility executives from $18,000 to $12,000).
D. Allocation of Employee Salaries.
In its final order, the PSC rejected Sunshine’s allocation of employee salaries between Sunshine and Heights, because it failed to include any allocation for administrative costs to Heights, and reduced the rate base by $6,692 for salaries and $572 for payroll taxes attributable to Heights. In so doing, the Commission calculated allocation of employee salaries between Sunshine and Heights by using the total number of customer connections or equivalent residential connections (ERCs) for each utility.
Initially, there is CSE to support the Commission’s decision to reject Sunshine’s allocation of employee salaries. The evidence discloses that Heights did not have its own offices and that Sunshine’s employees were used to work for Heights. Sunshine allocated $770 for employee salaries to Heights, which represented actual time Sunshine maintenance employees spent doing Heights work, yet no allocation was made concerning administrative time. This flaw in Sunshine’s calculations, which utility witnesses Sehneid *312 er and Nixon admitted and PSC witness Willis confirmed, supports the PSC’s decision rejecting Sunshine’s allocation.
We reverse, however, based on the manner in which the PSC computed the allocation. PSC witness Willis agreed with utility witness Nixon that the best way to allocate employee expense was actual time expended, and, as indicated by Schneider and Nixon’s testimony, actual time sheets were submitted to support the allocation of $770 to Heights for maintenance work.[3] Thus, there is no CSE to support the allocation of employee salaries based on ERCs as to the maintenance work done by Sunshine employees for Heights. See General Tel. Co. of Fla. v. Florida Pub. Serv. Comm’n, 446 So.2d 1063, 1068 (Fla.1984) (when determining amount of income tax expense to be allocated to a utility during ratemaking, PSC attempts to ascertain a pragmatic figure which reflects actual cost to the utility); Citizens of Fla. v. Hawkins, 356 So.2d 254, 260 n. 18 (Fla.1978) (in determining allocation of income tax from parent utility to subsidiary, PSC noted that actualities are preferred over hypothetieals).
As to the amount of salaries allocated for administrative work performed for Heights, however, the record is uncontradict-ed that Sunshine did not provide evidence of same, and Willis testified that the PSC’s standard procedure in such instances is to calculate an allocation based on ERCs. Thus, the record supports the PSC’s decision to allocate administrative employees’ salaries based on ERCs. We therefore reverse the order as to the adjustment for employee salaries and remand with directions to calculate field work by actual time and administrative work by ERCs.
AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.
ZEHMER, C.J., concurs and dissents with written opinion.
WEBSTER, J., specially concurs with written opinion.

. Section 367.081(2)(a), Florida Statutes (1989), requires the commission to fix rates which are "just, reasonable, compensatory, and not unfairly discriminatory.” In so doing, "the commission shall not allow the inclusion of contributions-in-aid-of-construction [CIAC] in the rate base of any utility during a rate proceeding.” It has been the PSC's policy to impute CIAC in those situations where the actual amount of CIAC has not been recorded on the utility's books, and the utilily fails to submit evidence of the actual amount of CIAC it has received. Florida Waterworks Ass’n v. Florida Pub. Serv. Comm'n, 473 So.2d 237, 243 (Fla. 1st DCA 1985) (affirmance of order upholding rules relating to imputing of CIAC), review denied, 486 So.2d 596 (Fla.1986). See also Rolling Oaks Utils., Inc. v. Public Serv. Comm'n, 418 So.2d 356, 357-58 (Fla. 1st DCA 1982) (where record showed that utility collected $500 for each lot sold in a subdivision it serviced. *309 PSC held such to be CIAC based on utility’s failure to adduce evidence that fees were collected for some reason other than to finance construction).

. PSC witness Forbes similarly testified that Mr. Hodges’ salary had increased 77.79 percent between 1989 and 1990.

. PSC witness Forbes also testified that actual time was documented when Sunshine employees worked at Heights.