731 So.2d 836 (1999)
FLORIDA PUBLIC SERVICE COMMISSION and Citizens of the State of Florida, Appellants,
v.
FLORIDA WATERWORKS ASSOCIATION and Florida Water Services Corporation, Appellees.
No. 98-1280.
District Court of Appeal of Florida, First District.
May 10, 1999.
*837 Robert D. Vandiver; General Counsel; Christiana T. Moore, Associate General Counsel, Public Service Commission, Tallahassee, for Appellant Florida Public Service Commission.
Jack Shreve, Public Counsel; Stephen C. Burgess, Deputy Public Counsel, Office of Public Counsel, Tallahassee, for Appellant Citizens of the State of Florida.
B. Kenneth Gatlin and Wayne L. Schiefelbein of Ruden, McClosky, Smith, Schuster & Russell, P.A., Tallahassee, for Appellee Florida Waterworks Association.
Kenneth A. Hoffman and J. Stephen Menton of Rutledge, Ecenia, Underwood, Purnell & Hoffman, P.A., Tallahassee; Matthew Feil, Florida Water Services Corporation, Apopka; and Arthur J. England, Jr., of Greenberg Traurig, P.A., Miami, for Appellee Florida Water Services Corporation.
BENTON, J.
The Florida Public Service Commission and the Citizens of the State of Florida by *838 and through the Office of Public Counsel appeal a final administrative order invalidating the Public Service Commission's proposed rule 25-30.431. An administrative law judge declared the proposed rule invalid on multiple grounds. We reverse.
Invoking section 120.54(5), Florida Statutes (1995), the Florida Waterworks Association (FWA) petitioned the Public Service Commission (PSC) to initiate rulemaking. As a result, the PSC published notice of rulemaking on August 2, 1996, proposing to adopt a rule on margin reserves which differed in two major particulars from the proposal on the subject FWA had attached to its petition to initiate rulemaking.
FWA then challenged the PSC's proposed rule by filing a petition for determination of invalidity of proposed rule under section 120.54(4), Florida Statutes (1995). On August 23, 1996, Florida Water Services Corporation (as it is now known) filed its own petition for determination of invalidity of proposed rule.
Simultaneously Florida Water Services Corporation (FWSC) submitted what was in effect a copy of the FWA proposal, which it denominated a "proposed lower cost regulatory alternative to the proposed rule." Responding in a revised statement of regulatory cost, the PSC took the position that the alternative did not facilitate just, reasonable, and compensatory rates, and did not therefore "substantially accomplish the objectives of the law being implemented." § 120.541(1)(a), Fla. Stat. (1997).
In due course, the PSC held a rulemaking hearing in which FWA, FWSC, other utilities, the Office of Public Counsel (OPC), the Department of Environmental Protection (DEP), and PSC staff participated. Apparently because of presentations made at the rulemaking hearing, the PSC published a notice of change reflecting changes in the proposed rule regarding the treatment of contributions-in-aid-of-construction in relation to margin reserves. Although the changes the PSC proposed worked in their favor, FWA and FWSC filed new petitions for determination of invalidity of proposed rule addressed to the proposed rule as changed.
All challenges to the proposed rule were consolidated for hearing before an administrative law judge, who found that "[p]roposed Rule 25-30.431, Florida Administrative Code is an invalid exercise of delegated legislative authority and may not be utilized by the PSC for its stated regulatory purposes." A wide-ranging final order concluded that (1) the PSC's revised statement of estimated regulatory costs did not meet the requirements of section 120.541 and was so deficient as to be a material failure to follow rulemaking procedures under section 120.52(8)(a); (2) the proposed rule made it "impossible for a utility to determine the nature and extent of the presentation necessary to obtain a margin reserve period of longer than 18 months"; (3) the proposed rule contravened the statute it was implementing by failing to provide a means for utilities to recover costs expended on projects required by governmental regulations; (4) the proposed rule denied the utility full recovery of reuse costs through rates; and (5) no competent substantial evidence supported the proposed rule.

Margin Reserves And Contributions-In-Aid-Of-Construction
A margin reserve reflects the extent to which a utility's investment in property available for future usealthough not being used to serve current rate payersis deemed used and useful in the public service and treated as investment on which a utility is entitled to earn a fair rate of return from current rates. The Legislature has directed the PSC to
fix rates which are just, reasonable, compensatory, and not unfairly discriminatory. In every such proceeding, the commission shall consider ... the cost of providing the service, which shall include, but not be limited to, debt interest; the requirements of the utility for working capital; maintenance, depreciation, *839 tax, and operating expenses incurred in the operation of all property used and useful in the public service; and a fair return on the investment of the utility in property used and useful in the public service. However, the commission shall not allow the inclusion of contributions-in-aid-of-construction in the rate base of any utility during a rate proceeding; and accumulated depreciation on such contributions-in-aid-of-construction shall not be used to reduce the rate base, nor shall depreciation on such contributed assets be considered a cost of providing utility service. The commission shall also consider the investment of the utility in land acquired or facilities constructed or to be constructed in the public interest within a reasonable time in the future, not to exceed, unless extended by the commission, 24 months from the end of the historical test period used to set final rates.
§ 367.081(2)(a), Fla. Stat. (1997) (emphasis supplied). We noted in Rolling Oaks Utilities v. Florida Public Service Commission, 533 So.2d 770, 773 (Fla. 1st DCA 1988):
Although the Commission does not have a formal rule or policy requiring a utility to maintain a reserve capacity, in given cases it makes an adjustment to a utility's rate base which, in a sense, rewards the utility for its investment in plant capacity which the utility has readily available, but not currently in use. By allowing a margin reserve increment to the rate base, the Commission permits the utility to charge its existing customers a portion of the cost necessary to have service available for future customers.
As future customers requiring new connections come on line, they are required to pay service availability fees which may be capitalized, in whole or in part, as contributions-in-aid-of-construction.
"Contribution-in-aid-of-construction" means any amount or item of money, services, or property received by a utility, from any person or governmental authority, any portion of which is provided at no cost to the utility, which represents a donation or contribution to the capital of the utility, and which is used to offset the acquisition, improvement, or construction costs of the utility property, facilities, or equipment used to provide utility services.
§ 367.021(3), Fla. Stat. (1997). When a utility's rate base includes a margin reserve and contributions-in-aid-of-construction accompany new connections, the utility's own investment in anticipation of the new customers' need for service is supplanted by the new customers' contributions-in-aid-of-construction each time a new customer connects to the system. Incrementally these contributions-in-aid-of-construction replace the utility's own original investment in reserve capacity.
"Moneys received as contributions-in-aid-of-construction cannot be included `in the rate base of any utility during a rate proceeding.' § 367.081(2)(a), Fla. Stat. (1997). See Florida Waterworks Ass'n v. Florida Public Serv. Comm'n, 473 So.2d 237, 243 (Fla. 1st DCA 1985)." Southern States Utils. v. Florida Pub. Serv. Comm'n, 714 So.2d 1046, 1057 (Fla. 1st DCA 1998). Consistently since the statute was amended to disallow contributions-in-aid-of-construction in rate base, Ch. 80-99, § 10, at 383, Laws of Fla., the PSC has interpreted section 367.081 to require that margin reserves be decreased by the imputation of contributions-in-aid-of-construction. See, e.g., In re Application of Marion Oaks Utils., 86 F.P.S.C. 10:403, 10:406 (1986); In re Application of Twin County Util. Co., 85 F.P.S.C. 5:149, 5:152 (1985).

The Proposed Rule
As changed, the rule the PSC proposed to adopt would authorize immediate imputation of only fifty percent (instead of one hundred percent as the PSC originally proposed) of projected contributions-in-aid-of-construction against the margin reserve. *840 The proposed rule would also engender a rebuttable presumption that an eighteen-month margin reserve period is appropriate. Proposed rule 25-30.431 reads:
(1) "Margin reserve" is defined as the amount of plant capacity needed to preserve and protect the ability of utility facilities to serve existing and future customers in an economically feasible manner that will preclude a deterioration in quality of service and prevent adverse environmental and health effects.
(2) "Margin reserve period" is defined as the time period needed to install the next economically feasible increment of plant capacity.
(3) Margin reserve is an acknowledged component of the used and useful rate base determination that when requested and justified shall be included in rate cases filed pursuant to section 367.081, Florida Statutes.
(4) Unless otherwise justified, the margin reserve period for water source and treatment facilities will be 18 months. In determining whether another margin reserve period is justified, the Commission shall consider the rate of growth in the number of equivalent residential connections (ERCs); the time needed to meet the guidelines of the Department of Environmental Protection (DEP) for planning, designing, and construction of plant expansion; and the other technical and economic options available for sizing increments of plant expansion.
(5)(a) Margin reserve for water source and treatment facilities and wastewater treatment and effluent disposal facilities shall be calculated as follows:
EG × MP × D = MR
where:
EG = Equivalent annual Growth in ERCs determined pursuant to (b) or (c) below
MP = Margin Reserve Period determined pursuant to subsection (4)
D = Demand per ERC (customer demand applied in the used and useful calculations for water and wastewater facilities)
MR = Margin reserve expressed in gallons per day (GPD)
(b) The equivalent annual growth in ERCs (EG) is measured in terms of the projected annual growth and shall be calculated in Schedules F-9 and F-10 of Form PSC/WAW 19 for Class A utilities and Form PSC/WAW 20 for Class B utilities, incorporated by reference in Rule 25-30.437.
(c) The utility shall also submit a linear regression analysis using average ERCs for the last 5 years. The utility may submit other information that will affect growth in ERCs.
(6) As part of its application filed pursuant to Rule 25-30.437, the utility shall submit its most recent wastewater capacity analysis report, if any, filed with DEP.
(7) Contributions-in-aid-of-construction (CIAC) shall be imputed when a margin reserve is authorized. The amount of imputed CIAC shall be determined based on 50 percent of the number of ERCs included in the margin reserve period and the projected CIAC that will be collected from those ERCs. However, the imputed CIAC shall not exceed the rate base component associated with margin reserve.
(Emphasis supplied.) FWA and FWSC favor a rebuttable presumption of a five-year margin reserve period instead of the eighteen-month period the PSC chose. FWA and FWSC also maintain that the utilities' margin reserves should never be reduced to reflect contributions-in aid-of-construction that the utilities receive as part of service availability fees they collect when making connections.

*841 Statement Of Estimated Regulatory Costs

Although rulemaking began before October 1, 1996, it continued thereafter. All parties have assumed that amendments to the Administrative Procedure Act that took effect on October 1, 1996, apply. We proceed on the same assumption. See Life Care Ctrs. of Am. v. Sawgrass Care Ctr., 683 So.2d 609 (Fla. 1st DCA 1996). Among the requirements effective October 1, 1996, is that an agency make a statement of estimated regulatory costs[1] whenever a substantially affected person submits "a good faith written proposal for a lower cost regulatory alternative to a proposed rule." § 120.541(1)(a), Fla. Stat. (Supp.1996). This requirement supersedes the economic impact statement requirement that existed under prior law.
In the order under review, the administrative law judge found fault with the PSC's revised statement of estimated regulatory costs. Apparently assuming (in this portion of the order) that every margin reserve period the PSC might allow under the proposed rule would last eighteen months, the final order states:
No analysis has been done as to the extra permitting costs incurred by the agencies, cost to the utilities, or cost to customers as a result of the 18-month margin reserve period in contrast with a longer period. The evidence established that costs to the permitting agencies would be reduced with a margin reserve period of greater than 18 months.
This analysis of the revised statement of estimated regulatory costs (SERC) ignores the fact that the actual margin reserve period in a given case depends on the evidence adduced in that case. The PSC can set a longer (or shorter) period as the evidence dictates.
The burden of proof in ratemaking cases in which a utility seeks an increase in rates rests on the utility. See South Fla. Natural Gas Co. v. Florida Pub. Serv. Comm'n, 534 So.2d 695 (Fla.1988); Florida Power Corp. v. Cresse, 413 So.2d 1187, 1191 (Fla.1982); Sunshine Utils. v. Florida Pub. Serv. Comm'n, 577 So.2d 663, 666 (Fla. 1st DCA 1991). By relieving the utility of its burden of proof as to an initial eighteen-month period, the proposed rule would lessen the utility's burden.[2] The proposed rule does not specify a margin reserve period for any particular ratemaking case or for any particular utility. With respect to the margin reserve period, the proposed rule would do no more than create *842 what is in effect a procedural rule in ratemaking cases.
In ratemaking cases in which a utility sought a margin reserve period of greater than eighteen months but not more than five years, the alternative presumptive five-year period proposed by FWA and FWSC would in effect shift the burden of proof to ratepayers, the PSC, or the Office of Public Counsel. In such cases, costs to the PSC under the challengers' alternative would not be "reduced with a [presumptive] margin reserve period of greater than 18 months." On the contrary, as the SERC points out, "adoption of [the PSC's proposed] rule regarding margin reserve and CIAC imputation may reduce the Commission staff effort required to prepare for and attend hearings on these issues." As for costs to government entities other than the PSC, the SERC acknowledges that "DEP ... may incur costs participating in future proceedings regarding the margin reserve period for individual utilities." The record contradicts the final order's assertion that the SERC contains no analysis "as to the extra permitting costs incurred by the agencies."
The record also belies the final order's assertion that the SERC contains no analysis "as to the ... cost to the utilities, or cost to customers as a result of the [presumptive] 18-month margin reserve period in contrast with a longer period." The analysis is, indeed, extensive. It includes the following:
A review of the file and suspend rate cases completed from 1993 through 1995 revealed that in a slight majority of the cases, the Commission determined that utility plant was 100 percent used and useful. Therefore, margin reserve was not a relevant issue in those cases....
The proposed rule requires two additional data filings ... for those utilities requesting margin reserve; however, the cost impact on the utility is expected to be minimal. The rule requires utilities to submit their most recent wastewater capacity analysis report to the Commission. This should result in minimal costs for the utilities because the report is currently prepared for DEP. Utilities are also expected to provide a linear regression of annual equivalent residential connections (ERCs) for the last five years. Although this calculation is currently performed by Commission staff, it is relatively straightforward and can be performed with a hand calculator.
The adoption of a Commission rule regarding margin reserve is expected to benefit ratepayers, the utilities, and Commission staff by reducing file and suspend rate case expenses. Rule adoption may help reduce rate case expenses by limiting testimony on margin reserve to special circumstances. However, if planned system additions include larger capacity than the minimum required for 18 months of growth, but which include economies of scale savings for the company and future customers, there may be additional time spent on related proceedings.
The SERC also points out that "[t]he proposed alternative would effectively remove the burden of justifying a longer margin reserve period from the utility and place greater risk on ratepayers for the costs of a larger, excessively-sized plant." Burdens "effectively removed" from utilities would logically come to rest on parties having to prove facts justifying margin reserve periods of five years or less. The administrative law judge erred in finding that the SERC was inadequate.

Rule Criteria Governing Rebuttal Of The Margin Reserve Period Presumption
Nor was the administrative law judge correct in declaring the proposed rule deficient in explicating factors for the PSC to consider in deciding whether a margin reserve period should be longer than eighteen months in a given ratemaking case. The proposed rule provides in pertinent part:

*843 In determining whether another [greater-than-18-month] margin reserve period is justified, the Commission shall consider the rate of growth in the number of equivalent residential connections[[3]] (ERCs); the time needed to meet the guidelines of the Department of Environmental Protection (DEP) for planning, designing, and construction of plant expansion; and the other technical and economic options available for sizing increments of plant expansion.
These are the very factors FWA advocated in its petition to initiate rulemaking and FWSC incorporated in its alternate proposal as criteria for shortening a presumptive five-year margin reserve period.[4] The question of estoppel aside, we reject the contention that these criteria render the proposed rule invalid.
Making a reference to "rules that confer unbridled discretion," the order under review concludes that the proposed rule "fails to give utilities adequate notice of what they must prove to obtain a margin reserve period of more than 18 months." But the terms the rule uses do not require regulatees of common intelligence and understanding to guess at their meaning. See generally State v. Rodriquez, 365 So.2d 157 (Fla.1978).
The administrative law judge's reliance on our decision in Cortes v. State, Board of Regents, 655 So.2d 132 (Fla. 1st DCA 1995), is misplaced. There the "challenged rule itself confer[red] unguided discretion on ... [administrators] that they did not have before the rule was promulgated." We said:
An administrative rule which creates discretion not articulated in the statute it implements must specify the basis on which the discretion is to be exercised. Otherwise the "lack of ... standards... for the exercise of discretion vested under the ... rule renders it incapable of understanding ... and incapable of application in a manner susceptible of review." Staten v. Couch, 507 So.2d 702 (Fla. 1st DCA 1987).
Cortes, 655 So.2d at 138. A rule which "fails to establish adequate standards for agency decisions, or vests unbridled discretion in the agency," § 120.52(8)(d), Fla. Stat. (Supp 1996), is invalid. But no rule is properly invalidated simply because "governing statutes, not the challenged rule, confer ... discretion." Cortes, 655 So.2d at 138. The proposed rule at issue here is not one "which creates discretion not articulated in the statute it implements." Id.
Unlike the proposed rule in Cortes, the rule the PSC has proposed here articulates criteria that would channel the exercise of statutory authority formerly constrained only by what the record in an individual ratemaking case contained. See In re Application of Palm Coast Util. Corp., 96 F.P.S.C. 11:27 (1996), appeal filed, No. 97-1720 (Fla. 1st DCA May 8, 1997) (finding eighteen-month margin reserve period appropriate); In re Application by Fla. Cities Water Co. (North Ft. Myers Div.), 96 F.P.S.C. 9:139 (1996) (finding three-year *844 margin reserve period appropriate); In re Application by Fla. Cities Water Co. (Golden Gate Div.), 95 F.P.S.C. 6:136 (1995) (finding nineteen-month margin reserve period appropriate). The PSC has, in numerous ratemaking cases decided over many years, established margin reserve periods on the authority of the statute aloneauthority all parties, including FWA and FWSC, properly take for granted and assume as the basis for their respective rule proposals.

Recovery Of Expenditures Made For Environmental And Other Regulatory Compliance
For reasons that are not entirely clear, the administrative law judge concluded that the proposed rule was invalid for failure "to provide a mechanism for full-cost recovery of capital improvements required by governmental regulations." In Florida Cities Water Company v. State, Florida Public Service Commission, 705 So.2d 620, 623 (Fla. 1st DCA 1998), we held:
"The commission shall ... consider the investment of the utility in land acquired or facilities constructed or to be constructed in the public interest within a reasonable time in the future...." § 367.081(2)(a), Fla. Stat. (1995). Capital expenditures necessary to comply with governmental regulations must be "considered" because they are "in the public interest." But utilities are entitled to a fair return only "on the investment of the utility in property used and useful in the public service." Id. Capital expenditures not "used and useful" at present are properly excluded from the rate base, even though reasonably incurred in the public interest. While such expenditures are presumably a proper basis for an allowance for funds prudently invested, no such allowance was requested in the present case.
To require the PSC to add to the rate base any and all expenditures another governmental agency's regulations require a utility to make, without regard to whether the expenditures are "used and useful" for current customers, would in effect transfer ratemaking authority from the PSC to the governmental agency requiring the expenditures.
But the proposed rule has only the most tenuous connection with these ratemaking issues. (Nor does its limited scope furnish a basis for invalidation.) The proposed rule does not purport to include or exclude any particular type or class of expenditure from rate base. It does not govern recovery of capital improvements of any kind based on the nature or purpose of the improvements.

Recovery Of Reuse Costs
The final order's conclusion that "the proposed rule would have the unlawful effect of denying a utility recovery of its reuse costs through rates, contrary to Sections 403.064(10) and 367.0817(3), Florida Statutes," is plainly mistaken. "[I]n order to comply with the statutory mandate requiring that the entire cost of a prudently constructed reuse facility be recovered in rates, such a reuse facility must be treated as if it were one hundred percent used and useful." Southern States, 714 So.2d at 1058. No question concerning a margin reserve arises as to property that is already "treated as if it were one hundred percent used and useful." Nothing in the text of the proposed rule would have any impact whatsoever on reuse facilities or their financing.

Competent Substantial Evidence Analysis Inapposite
Finally, the administrative law judge concluded that there was a fatal absence of competent substantial evidence to support the presumptive eighteen-month margin reserve period contemplated by the proposed rule, and to support the proposed rule's imputation even of only fifty per cent of contributions-in-aid-of-construction against margin reserves. This was error. While numerous expert witnesses offered views on both of these questions, the former is essentially a matter of Commission procedure and the latter is statutory policy at the core of the legislative *845 prohibition against including contributions-in-aid-of-construction in rate base. See § 367.081(2)(a), Fla. Stat. (1997).
A rebuttable presumption, like the one the proposed rule would engender, giving structure to administrative proceedings at which facts may be fully and fairly litigated, presents a wholly different question than an irrebuttable presumption promulgated by an agency seeking to foreclose a meaningful evidentiary showing altogether. See Jenkins v. State, Dep't of Health and Rehabilitative Servs., 618 So.2d 749, 751 (Fla. 1st DCA 1993); McDonald v. Department of Prof'l Regulation, Bd. of Pilot Comm'rs, 582 So.2d 660, 664 (Fla. 1st DCA 1991). The proposed rule's rebuttable presumption affords utilities the opportunity to avoid the expense of litigating the initial eighteen months of any margin reserve period.
"[C]ontributions-in-aid-of-construction cannot be included `in the rate base of any utility during a rate proceeding.'" Southern States, 714 So.2d at 1056. The contributions-in-aid-of-construction in question here accrue, contribution by contribution, over the whole life of the property held in reserve for future use. Thus initially imputing less than one hundred percent against the margin reserve (or otherwise treating as an offset to rate base all projected contributions-in-aid-of-construction) is justified by the time value of money. But, with reference to contributions-in-aid-of-construction, we have said unequivocally that the "Legislature has... specified a particular accounting treatment by statute which the PSC is not at liberty to ignore." Id. The proposed rule's refusal to allow more than a fifty per cent setoff is in keeping with the treatment the statute requires.
Reversed.
BOOTH and VAN NORTWICK, JJ., CONCUR.
NOTES
[1] A statement of estimated regulatory costs shall include:

(a) A good faith estimate of the number of individuals and entities likely to be required to comply with the rule, together with a general description of the types of individuals likely to be affected by the rule.
(b) A good faith estimate of the cost to the agency, and to any other state and local government entities, of implementing and enforcing the proposed rule, and any anticipated effect on state or local revenues.
(c) A good faith estimate of the transactional costs likely to be incurred by individuals and entities, including local government entities, required to comply with the requirements of the rule. As used in this paragraph, "transactional costs" are direct costs that are readily ascertainable based upon standard business practices, and include filing fees, the cost of obtaining a license, the cost of equipment required to be installed or used or procedures required to be employed in complying with the rule, additional operating costs incurred, and the cost of monitoring and reporting.
(d) An analysis of the impact on small businesses as defined by s. 288.703, and an analysis of the impact on small counties and small cities as defined by s. 120.52.
(e) Any additional information that the agency determines may be useful.
(f) In the statement or revised statement, whichever applies, a description of any good faith written proposal submitted under paragraph (1)(a) and either a statement adopting the alternative or a statement of the reasons for rejecting the alternative in favor of the proposed rule.
§ 120.541(2), Fla. Stat. (Supp.1996).
[2] The proposed rule would increase the burden for opposing litigants correspondingly. No party subject to an increased burden has challenged the 18-month presumption, however.
[3] Although undefined in the proposed rule, the term "equivalent residential connection" is a term of art FWA and FWSC have never suggested caused anyone concern. See generally Southern States, 714 So.2d at 1056 ("Equivalent residential connections (ERCs) are calculated by counting the number of water meters connected and adjusting for the size of any meter larger than the standard meter for a single family dwelling."); Sun Bank v. Edmunds, 624 So.2d 753, 754 (Fla. 1st DCA 1993); Sunshine Utils. of Cent. Fla. v. Florida Pub. Serv. Comm'n, 624 So.2d 306, 311 (Fla. 1st DCA 1993); Fla. Admin. Code R. 25-30.515(8).
[4] FWSC proposed the following language:

In determining the margin reserve period, the Commission shall consider, but not be limited to, the rate of growth in customers and demand, the time needed to meet the guidelines of the Department of Environmental Protection for planning, design and construction of plant expansion, and the available technical and economic options available for sizing increments of plant expansion. Unless otherwise justified, the margin reserve period for water source and treatment facilities and wastewater treatment and effluent disposal facilities is set at five years.