POLSTON, J.
This case is before the Court on appeal from three orders of the Florida Public Service Commission (PSC).[1] The PSC approved the recovery of Florida Power and Light’s (FPL) costs incurred through its joint venture with an oil and natural gas company to engage in the acquisition, exploration, drilling, and development of nat *899 ural gas wells in Oklahoma. The recovery as fuel costs paid by FPL’s customers in its utility rates were considered by the PSC to be a long-term physical hedge. Treating these activities as a hedge requires FPL’s end-user consumers to guarantee the capital. investment and operations of a speculative oil and gas venture without the Florida Legislature’s authority. Accordingly, we reverse.
I. BACKGROUND
Each year, the PSC creates a docket (fuel docket or fuel clause) to review and allow cost-recovery of fuel expenditures as well as to review hedging activities intended to minimize fuel price volatility by Florida’s investor-owned utilities. In 2014, FPL filed its petition seeking cost recovery for its fuel costs, and, in determining the proper amount for which FPL could receive cost recovery, the PSC approved FPL’s hedging activities.
In the 2014 fuel clause proceeding, FPL also filed a petition requesting approval and recovery of a specific gas reserves investment, the Woodford Project. This petition requested a determination that FPL would be eligible to recover, through the fuel clause, its “exploration expense, depletion expense, operating expenses, G & A, taxes, transportation costs and a return on the unrecovered investment, including working capital” for investments in the exploration, drilling, and production of natural gas in the Woodford Shale Gas Region in Oklahoma. The Woodford Project is a joint venture agreement between FPL and PetroQuest, a publically traded independent oil and natural gas company. Pursuant to the agreement, FPL would invest directly in PetroQuest’s shale gas reserves in the Woodford Shale region and in return receive the rights to a share of the physical gas produced.
FPL alleged that it was looking for opportunities to acquire natural gas at production costs (as'an investor), rather than at market prices- (as a purchaser), in order to help insulate customers from the volatility of the gaS market. Specifically, FPL asserted that its ownership interest in the Woodford Project would operate as a long-term physical hedge against the market volatility of natural'gas prices used to provide electric service to FPL’s customers. FPL also asserted that the Woodford Project would benefit its customers by providing natural gas at a lower cost than market prices.
Citizens of the State of Florida, through the Office of Public Counsel, (Citizens), Florida Industrial Power Users Group (FIPUG), and Florida Retail. Federation (FRF) participated as intervenors in the proceedings. - Citizens and the Florida Industrial Power Users Group (FIPUG) .moved to dismiss the Woodford Petition, alleging that the PSC lacked the authority to consider and approve the project. The PSC denied the motion, concluding that it had jurisdiction under its statutory authority to set rates for public utilities.
Thereafter, the PSC heard FPL’s testimony that investment in the Woodford Project would provide fuel savings and price stability, effectively acting as a long-term hedge. The PSC also heard testimony from Appellants that the costs associated with the Woodford Project do not satisfy the criteria for fuel clause recovery and that these projected' costs went beyond PSC policy for dealing with fossil fuel-related costs normally recovered through base rates. Following the two-day eviden-tiary proceeding, the PSC approved the Woodford Project, concluding as follows:
We find the Woodford Project, in the manner described in the FPL petition and evidence on the record, is expected to produce customer benefits and is in the public interest. . We find its costs are recoverable through the Fuel *900 Clause. In order to provide additional protections for FPL customers, we find it necessary to add two conditions for compliance with this Order. First, FPL shall add the appropriate subaccounts, under the FERC system of accounting, which will correspond on a one-on-one basis with the accounts used by the Gas Reserve Company (GRCO). Second, FPL shall utilize an independent auditor in performing the audits provided in the agreement and shall work with [PSC] staff to develop the scope of the audits.
II. ANALYSIS
Appellants argue that the PSC lacks the authority to allow FPL to recover the capital investment and operations costs of its partnership in the Woodford gas reserves through the rates it charges consumers. We agree.[2]
This Court has repeatedly stated that, although “orders of the Commission come before this Court clothed with the statutory presumption that they have been made within the Commission’s jurisdiction and powers, and that they are reasonable and just and such as ought to have been made,” “[s]uch deference ... cannot be accorded when the commission exceeds its authority. At the threshold, we must establish the grant of legislative authority to act since the [Commission derives its power solely from the legislature.” United Tel. Co. of Fla. v. Pub. Serv. Comm’n, 496 So.2d 116, 118 (Fla.1986); see also Sprint-Florida, Inc. v. Jaber, 885 So.2d 286, 290 (Fla.2004). Whether the PSC has the authority to act is a question of law, which is subject to de novo review. See D’Angelo v. Fitzmaurice, 863 So.2d 311, 314 (Fla.2003).
Chapter 366, Florida Statutes (2014), provides the PSC with jurisdiction to regulate and supervise each public utility with respect to its rates and service and to prescribe a rate structure for all electric utilities. § 366,04(l)-(2), Fla. Stat. (2014); Pub. Serv. Comm’n v. Bryson, 569 So.2d 1253, 1254 (Fla.1990) (noting that “[i]n section 366.04(1) ... the [Legislature granted the PSC exclusive jurisdiction over matters respecting the rates- and service of public utilities”). The regulation of public utilities is in the public interest and “an exercise of the police power of the state for the protection of the public welfare and all the provisions [of chapter 366] shall be liberally construed for the accomplishment of that purpose ” § 366.01, Fla. Stat. (2014). The PSC may set rates that are “fair, just, and reasonable.” See § 366.06(1), Fla. Stat. (2014) (“[T]he commission shall have the authority to determine and fix fair, just, and reasonable rates that may be requested, demanded, charged, or collected by any public utility for its service.”); see also § 366.03, Fla. Stat. (2014) (“All rates and charges made, demanded, or received by any public utility ... shall be fair' and reasonable.”); § 366.05(1), Fla. Stat. (2014) (“In the exercise of such jurisdiction, the commission shall have power to prescribe fair and reasonable rates and charges.”). In fixing the fair, just, and reasonable rates charged for service by the “public utilities under its jurisdiction, the commission is authorized to give Consideration, among other'things, to ... the cost of providing such service and the value of such service to the public[.]” § 366.041(1), Fla. Stat. (2014).
Section 366,02(1), Florida Statutes (2014), defines a “public utility” as “every person, corporation, partnership, association, or other legal entity and their lessees, trustees, or receivers supplying electricity *901 or gas (natural, manufactured, or similar gaseous substance) to or for ..the public within this state[.]” An “electric utility” is “any municipal electric utility, investor-owned electric utility, or rural electric cooperative which owns, maintains, or oper-. ates an electric generation, transmission, or distribution system within the state.” § ‘ 366.02(2), Fla. Stat. (2014).
It is undisputed that FPL is an electric utility. It is also undisputed that the PSC’s ratemaking authority encompasses the authority to examine fuel cost expenditures and approve cost recovery to compensate for utilities’ fuel expenses through the fuel clause. See Gulf Power Co. v. Fla. Publ. Serv. Comm’n, 487 So.2d 1036, 1037 (Fla.1986).
However, the PSC does not have the statutory authority to approve cost recovery for FPL’s investment in the Woodford Project. As explained above, section 366.06(1) provides that the PSC has the authority to determine and fix fair, just, and reasonable rates for public utilities, and section 366.02(2) defines an electric utility as owning, maintaining, or operating an electric generation, transmission, or distribution system. Therefore, under the plain meaning of these two statutes, cost recovery is permissible only for costs arising from the “generation, transmission, or distribution” of electricity. The Woodford Project’s exploration, drilling, and production of natural gas fuel in Oklahoma do not constitute generating, transmitting, or distributing electricity in Florida as the meaning of those terms .are plainly understood. In other words, the exploration, drilling, and production of fuel falls outside the purview of an electric utility as defined by the Legislature.
Additionally, the PSC does not have the statutory authority necessary to approve cost recovery fojr the Woodford Project through the characterization of the project as “a long-term physical hedge.” While PSC’s ratemaking authority includes examining and approving cost recovery for public utilities’ hedging of fuel costs, see In re: Fuel and Purchased Power Cost Recovery Clause with Generating Performance Incentive Factor, Order No. PSC-08-0667-PAA-EI, 2008 WL 6347188 (Fla. P.S.C. Oct. 8, 2008), the Woodford Project does not involve a certain quantity of fuel for a certain price.
The fuel cost adjustment clause is a cash flow mechanism to allow utilities to recover costs for unanticipated changes in fuel costs between ratemaking proceedings. See Gulf Power Co., 487 So.2d at 1037 (“Fuel adjustment charges are authorized to compensate for utilities’ fluctuating fuel expenses. The fuel adjustment proceeding is a continuous proceeding and operates to a utility’s benefit by eliminating regulatory lag.”). The mechanism also permits utilities to recover actual costs of financial derivatives and physical hedges that help prevent price shocks from volatile fuel costs. However, regulated utilities through the fuel clause do not earn a return on money spent to purchase, fuel. Likewise, while the costs of hedging contracts are pass-through costs, utilities through the fuel clause do not earn a return on the cost of hedging positions purchased.
Specifically, hedging involves locking in a future price to avoid the adverse effects of price fluctuations, and utilities can hedge by entering into financial arrangements to secure natural gas at a future point in time at a fixed price. See Stephen Maloney, When the Price is Right, 145 No. 10 Pub. Util. Fort. 24, 25-26 (Oct.2007). ‘While comprising mostly options and swaps, financial hedging instruments can include futures, basis swaps, and fixed-price swaps involving natural gas.” Id. at 25. Moreover, “[i]n addition to financial instruments, weather derivatives and natu *902 ral-gas storage provide important vehicles for mitigating price volatility through physical hedges against shortages and disruptions to pipeline operation's.” Id. at 26.
Permitting advance recovery of FPL’s investment in the Woodford Project’s exploration and production of natural gas will not pay for the costs of actual fuel. It will provide recovery, instead, for investment, operation, and maintenance and operation of assets that will provide access to an unknown quantity of fuel in the future. It is impossible to know what the costs of the natural gas will be until it is actually produced. . There is more uncertainty from this investment rather than less. Therefore, it cannot be characterized as a physical hedge..
Additionally, under FPL’s proposal for the Woodford Project, ratepayers (not FPL) bear the risk of natural gas price volatility and all of the production risks. If the production cost of extracting natural gas from the Woodford wells, including profit , paid to FPL-on its capital investment, is less than the natural gas market price, the ratepayers will benefit. However, if the production costs of extracting natural gas from the Woodford wells is more than the natural gas market, the ratepayers do not benefit but will instead suffer a loss. The monies spent on the Woodford Project are not a mere pass-through, like other fuel expenses, because FPL will earn- a return on its capital • expenditures. Accordingly, the Woodford Project is a guaranteed capital investment for FPL; it is not a hedge to stabilize- fuel costs. ■ •
This may be a good idea, but Whether advance cost recovery of speculative capital investments in gas exploration and production by an electric' utility is in the public interest is a policy determination that must be made by the Legislature. For •example, in contrast to natural gas exploration and production, the Legislature has authorized the PSC to approve cost recovery for capital investments in nuclear power plants and energy efficient and renewable energy power sources. See §§ 366.8255; 366.92; 366.93, Fla. Stat. (2014).' Without statutory authorization from the. Legislature, the' recovery of FPL’s costs and capital investment in the Woodford Project through the fuel clause is overreach.-
III. CONCLUSION
Accordingly, because the PSC exceeded its statutory authority when approving recovery of FPL’s costs and investment in the Woodford Project, we reverse.
It is so ordered.
LABARGA, C.J./ and PARIENTE, LEWIS, QUINCE, and PERRY, JJ., concur.
.CANADY, J., dissents with an opinion.

. We have jurisdiction. ' See art. 'V, § 3(b)(2), - Fla. Const.

.' We reject, without further comment, all the other arguments raised in the briefs by the parties.