# Supreme Court of Florida

_____

No. SC16-141
_____

**CITIZENS OF THE STATE OF FLORIDA,**
Appellant,

vs.

**ART GRAHAM, etc., et al.,**
Appellees.

[March 16, 2017]

LEWIS, J.

This case is before the Court on appeal from a decision of the Florida Public Service Commission relating to the rates or service of a public utility providing electric service. We have jurisdiction. See art. V, § 3(b)(2), Fla. Const.

## FACTUAL AND PROCEDURAL BACKGROUND

Florida Public Utilities Company (FPUC) is an investor-owned electric utility located in Fernandina Beach, Florida. FPUC does not generate its own electricity, but instead relies solely on wholesale purchase power agreements with other electric utilities.

Our discussion begins on August 29, 2014, when FPUC entered into a settlement agreement with the Office of Public Counsel (OPC) in resolution of its then pending petition for an increase in base rates. In re Application for Rate Increase by Fla. Pub. Utils. Co. (Settlement Agreement Order), Order No. PSC-14-0517-S-EI, at 1, 2014 WL 4960917 (Fla. P.S.C. Sept. 29, 2014). Section I of the settlement agreement prohibits FPUC from increasing its base rates thereafter until at least December 31, 2016.[1] Further coloring that prohibition, Section VI of the settlement agreement, entitled "Other Cost Recovery," specifically delineated what costs FPUC might seek recovery of through other mechanisms, such as the Commission's fuel clause proceedings:

> Nothing in this agreement shall preclude the Company from requesting the Commission to approve the recovery of costs that are:

---

1. The relevant provision provides in pertinent part:

I. Term

    a. This Agreement will take effect upon Commission approval and shall be implemented on the date of the meter reading for the first billing cycle of November 2014 ("Implementation Date") and continue at least until the last billing cycle of December 2016. The base rates, charges and related tariff term sheet terms and conditions established as a result of this Agreement will continue beyond December 2016 unless and until changed by Commission Order. The period from the Implementation Date through the last billing cycle in December 2016 may be referred to herein as the "Minimum Term".

    b. The Parties agree that no increase or reduction in base rates shall be sought by the Parties during the Minimum Term unless other terms of this Agreement allow.

(a) of a type which traditionally and historically would be, have been, or are presently recovered through cost recovery clauses or surcharges, or (b) incremental costs not currently recovered in base rates which the Legislature or Commission determines are clause recoverable subsequent to the approval of this settlement. Except as provided in this Agreement, it is the intent of the Parties in this Paragraph VI that FPUC <u>not be allowed</u> to recover through cost recovery clauses increases in the magnitude of costs, incurred after implementation of the new base rates, of types or categories (including but not limited to, for example, investment in and maintenance of transmission assets) that have been traditionally and historically recovered through FPUC's base rates.

In re Application for Rate Increase by Fla. Pub. Utils. Co., Docket No. 140025-EI, Document No. 04856-14 (Aug. 29, 2014) (emphasis added). On September 29, 2014, this settlement agreement was unanimously approved by the Commission. See generally Settlement Agreement Order, No. PSC-14-0517-S-EI, at 1, 2014 WL 4960917 ("Having reviewed the Settlement and the pleadings, and heard argument of counsel, we find that the Settlement is in the best interests of FPUC's ratepayers and hereby approve it."). Further, the Commission's Order incorporated by reference the entire settlement agreement and thereby adopted its terms as its policy. Id. at 3.

About one year later, on September 1, 2015, FPUC petitioned the Commission for approval of its fuel adjustment and purchased power cost recovery factors for the period of January 2016 through December 2016. In pertinent part, and contrary to the settlement agreement, FPUC's petition sought to recover costs associated with constructing a new interconnection with Florida Power & Light

- 3 -

Company (FPL). Specifically, FPUC sought to initially recover $107,333 in depreciation expense, taxes other than income taxes, and a return on investment associated with the $3.5 million dollar cost of its interconnection project. According to FPUC's petition, the FPL interconnection "will result in [FPUC] being better situated in terms of negotiating a new power purchase agreement for [its] Northeast Division to follow [its] current agreement." Indeed, at the time, FPUC had a purchased power agreement with which it purchased power exclusively from Jacksonville Electric Authority (JEA) to serve its Northeast Division, which encompasses its customers on Amelia Island. FPUC's agreement with JEA is set to expire on December 31, 2017. Thus, with construction of the FPL interconnection, FPUC asserts that it will increase its potential providers from one to two, and presumably give it a basis to negotiate a more favorable price for its purchased power, the savings from which will be passed on to its customers in the form of lower rates.

Despite the stated altruistic intentions of this proposed project, the OPC objected to FPUC's petition. In relevant part, the OPC asserted that the costs associated with the FPL interconnection were among the types of costs barred by the provisions of the settlement agreement quoted above. Likewise, the Commission's staff prepared a memorandum in which it recommended that FPUC's petition be denied due to the settlement agreement's provisions. During a

subsequent hearing, a commissioner questioned staff about the settlement agreement's effect and suggested it prohibited FPUC's request. Nevertheless, the Commission ultimately voted to reject the staff's recommendation and approved the recovery of the entire FPL interconnection costs, contrary to the terms of the settlement agreement. The dissent simply ignores this information and materials submitted by the Commission's own staff and OPC.

Despite the prior objections and discussions concerning the settlement agreement's application to the FPL interconnection, such consideration and analysis were conspicuously missing from the Commission's order with regard to the FPL interconnection costs. In re Fuel & Purchased Power Cost Recovery Clause with Generating Performance Incentive Factor (Order Below), No. PSC-15-0586-F0F-EI, at 11-15, 2015 WL 9450334 (Fla. P.S.C. Dec. 23, 2015). Specifically, the order only addressed and analyzed the settlement agreement's effect on the entirely separate issue of FPUC's ability to recover legal and consulting fees associated with the project, not the entire construction costs. Id. at 13-14. This factor is also ignored by the dissent. Instead, the only analysis offered by the Commission that related to construction of the transmission interconnection centered on the reliability enhancements and the potential savings to customers:

> All parties agree that the proposed interconnection with FPL will result in improved system reliability for Amelia Island. Nor is there disagreement that interconnection with FPL will offer wholesale power purchase options not currently available to FPUC when its

wholesale power agreement with JEA expires in December 2016.[2] The disagreement rests with the OPC's conclusion that [Commission] Order No. 14546 prohibits cost recovery until cost savings are received by ratepayers. We do not read Order No. 14546 that restrictively.

Therefore, we find that the interconnection with FPL and the consulting and legal fees associated with the development and enactment of projects designed to reduce fuel rates to FPUC's customers, costs associated with the development and negotiations of power supply contracts, and costs to consultants engaged in performing due diligence in review and analysis of the Renewable Energy Agreement between FPUC and Rayonier shall be recovered through the fuel cost recovery clause.

Id. at 15.

Left without an explanation as to why FPUC's petition was approved over its objections without consideration and application of the terms of the settlement agreement, the OPC has now appealed the Commission's order. This review follows.

**ANALYSIS**

When reviewing an order of the Commission, this Court affords great deference to the Commission's findings. S. All. for Clean Energy v. Graham, 113 So. 3d 742, 752 (Fla. 2013) (noting that this Court has repeatedly held that "[t]he Commission's orders, and concomitant interpretations of statutes and legislative

---

2. As noted previously, the record indicates that FPUC's wholesale power purchase agreement with JEA actually expires in December 2017. This appears to be a scrivener's error in the Commission's order.

policies that it is charged with enforcing, are entitled to great deference" (quoting Crist v. Jaber, 908 So. 2d 426, 430 (Fla. 2005))). "Commission orders come to this Court clothed with the presumption that they are reasonable and just." W. Fla. Elec. Coop. Ass'n, Inc. v. Jacobs, 887 So. 2d 1200, 1204 (Fla. 2004) (citing Gulf Coast Elec. Coop., Inc. v. Johnson, 727 So. 2d 259, 262 (Fla. 1999)). Moreover, "[t]o overcome these presumptions, a party challenging an order of the Commission on appeal has the burden of showing a departure from the essential requirements of law and the legislation controlling the issue, or that the findings of the Commission are not supported by competent, substantial evidence." S. All. for Clean Energy, 113 So. 3d at 752 (citing Jacobs, 887 So. 2d at 1204).

In this case, the OPC contends that the Commission departed from the essential requirements of law by failing to explain why it did not consider and apply the settlement agreement. Furthermore, the OPC contends that the settlement agreement bars FPUC's petition in this case. We agree with the OPC on both contentions.

As an initial matter, however, FPUC and the Commission contend that the issue of the settlement agreement was waived and not properly before the Commission. We find these contentions to be meritless at best. Not even the dissent attempts to support this meritless position. It is glaringly obvious that the settlement agreement was adequately presented to the Commission.

First, the OPC properly raised the issue in its prehearing statement prior to the Commission's waiver deadline:

> Recovery of costs associated with transmission lines are not fossil-fuel-related costs. Transmission costs are traditionally and historically recovered through base rates, not the fuel clause. Additionally, FPUC's request to recover these costs in the fuel clause violates the Company's rate case stipulation pursuant to Order PSC-14-0517-S-EI. Further, FPUC's argument that the transmission costs should be recovered as 2016 fuel costs should be rejected as the opportunity for potential "fuel savings" will not occur in 2016 because the current Purchase Power Agreement . . . does not expire until 2017 and this plant will not go into service until the end of 2017.

(Emphasis added.) Second, following a hearing in which one of the FPUC witnesses discussed the settlement agreement during cross-examination, the Commission staff prepared a detailed analysis in which it reasoned that OPC's objection was correct and recommended denying FPUC's request:

> Finally, FPUC has argued that the FPL interconnection is not prohibited by the settlement agreement because it will allow FPUC to reduce the price of its wholesale purchased power. For FPUC reducing the price of purchased power is the equivalent of reducing the price of fossil fuels for the other IOUs. FPUC argues that Order No. 14546 applies to purchased power as well as fossil fuels and should be used here to allow recovery of the FPL interconnection costs. FPUC dismisses the plain language of Section VI of the settlement agreement which does not allow recovery of "investment in and maintenance of transmission assets that have been traditionally and historically recovered through FPUC's base rates" on two rationales. First, Exhibit A to the settlement agreement entitled "Planned Capital Improvements" covering the period 2016-2019 does not list the FPL interconnection project. Second, the prohibition against recovery of transmission projects in the settlement agreement applies only to "investment in, or maintenance of, existing transmission."

Staff agrees with FPUC that if the provisions of Order No. 14546 are not applied to purchased power, there is very little guidance as to what is recoverable in terms of purchased power through the fuel clause. Certainly, this is the first instance in which FPUC, the only non-generating electric utility in the state, has requested recovery of a transmission asset through the fuel clause. However, staff does not agree that the explicit terms of the settlement agreement should be dismissed summarily.

The settlement agreement does not state that the prohibition against recovery of transmission costs through the fuel clause is limited to the projects listed on Exhibit A. In its joint motion with OPC for approval of stipulation and settlement, FPUC stated that "FPUC will use all reasonable infrastructure projects, consistent with those outlined in demonstrative Exhibit A, attached to the Agreement, in order to maintain the reliability of its electrical system." The joint motion also reiterated that "The Company may continue to seek recovery of costs through recovery clauses, but cannot seek recovery of costs that the Company has traditionally and historically recovered through base rates." Given the language in its motion, the fact that the FPL interconnection was not included on Exhibit A does not support the conclusion that its costs are exempt from the settlement agreement's specific prohibition against the recovery of transmission costs through the fuel clause. Nor does the motion's or the settlement agreement's prohibition against recovery through the fuel clause contain any language limiting prohibited transmission projects to existing projects. FPUC has cited no specific provision of the settlement agreement to support this contention nor is there any testimony or record evidence to support it.

Witness Cutshaw agreed that transmission rate base costs were normally recovered through base rates and that the proposed FPL interconnection was part of a transmission asset. While there may be potential savings associated with the project, the plain language of the settlement agreement prohibiting recovery of capital costs of transmission projects does not support recovery of these costs through the fuel adjustment clause.

(footnotes omitted) (record citations omitted).

Finally, the settlement agreement and the staff's analysis occupied nearly the entirety of the Commission's deliberations concerning FPUC's request:

Commissioner Edgar: Thank you, Mr. Chairman.

Looking at 4A and 4B, both together and separately, I find 4A in particular to be, once again, maybe one of those issues where we're in a bit of a box due to the hearing process. Not a complaint but just kind of, you know, the process is what the process is required to be.

From the record evidence what we have in 4A before us is cost recovery for a project by FPUC that is—the testimony says will be an improvement to the transmission for that small transmission and distribution utility, that will reduce the price of wholesale purchased power, that it will save fuel costs, and that it is in the public interest. That is my understanding of the testimony. If anybody disagrees, I certainly am open to discussing that. But yet it is being recommended, and I understand the reasons why, for not recovery for costs through the fuel clause even though, again, the project is intended to have fuel savings.

<u>There is the complicating factor of the settlement agreement in the last rate case that we approved, and I do believe that the settlement agreement was in the public interest as we voted at that time. But, Commissioners, I would just ask if there are thoughts or if there are discussions about the staff recommendation on this item.</u>

Chairman Graham: That question was to staff?

Commissioner Edgar: No, it was to my colleagues.

Chairman Graham: Commissioner Brown.

Commissioner Brown: Well, I—thank you, Mr. Chairman. I looked at this issue. I actually highlighted this one specifically because I remember the testimony of the witness, and it was an important project, an integral project. <u>Unfortunately the utility is hamstrung, hamstrung by the settlement agreement, which I believe reads that specifically this type of cost recovery is not allowed under clauses and it cites investment and maintenance of transmission assets.</u>

- 10 -

Staff, that settlement agreement is part of the record, and what is the expiration date of that agreement?

Ms. Brownless:  The minimum term of the settlement agreement ends on December 31st, 2017.

Commissioner Brown:  2017.

Ms. Brownless:  2016.  I'm sorry.

Commissioner Brown:  2016.  So could the utility file testimony in the next year's fuel docket to recover costs associated with this item?

Ms. Brownless:  Yes, ma'am.

Commissioner Brown:  Okay.  And not be prohibited under the settlement agreement?

Ms. Brownless:  Yes.

Commissioner Brown:  Okay.  Those are really my only thoughts.

Chairman Graham:  Okay.  I would still entertain a motion. Commissioner Edgar.

Commissioner Edgar:  Thank you, Mr. Chairman.
Then I would move that we disagree with—reject the staff recommendation on Item 4 and approve recovery of the costs for the interconnection between FPL's substation in FPUC's northeast division through the fuel recovery clause.  That's my motion.  My thinking on that is I do believe that it will have cost savings in fuel for the customers moving forward.

Chairman Graham:  Okay.  We have the Edgar 2 motion moved and seconded.  Is there any further discussion on that motion?  Seeing none, all in favor, say aye.  Any opposed?  All say aye.

(Vote taken.)

Thank you. All opposed? Any opposed? Seeing none, you have approved that motion.

(Emphasis added.)

Therefore, we cannot see how this issue was not properly raised before the Commission. Accordingly, to the extent the Commission held the issue waived, we reverse.

Turning to the merits, we hold that the Commission departed from the essential requirements of law by failing to adequately address application of the settlement agreement to the FPL transmission interconnection costs.

Section 120.68(1)(a), Florida Statutes, provides: "A party who is adversely affected by final agency action is entitled to judicial review." § 120.68(1)(a), Fla. Stat. (2016). " 'Agency action' means the whole or part of a rule or order, or the equivalent, or the denial of a petition to adopt a rule or issue an order. The term also includes any denial of a request made under s. 120.54(7)." § 120.52(2), Fla. Stat. (2016). Guiding judicial review in this context, section 120.68(7) provides in part:

> (7) The court shall remand a case to the agency for further proceedings consistent with the court's decision or set aside agency action, as appropriate, when it finds that:
> . . . .
> (d) The agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action; or
>
> (e) The agency's exercise of discretion was:

1. Outside the range of discretion delegated to the agency by law;

2. Inconsistent with agency rule;

3. Inconsistent with officially stated agency policy or a prior agency practice, if deviation therefrom is not explained by the agency; or

4. Otherwise in violation of a constitutional or statutory provision;

but the court shall not substitute its judgment for that of the agency on an issue of discretion.

§ 120.68(7), Fla. Stat.

These provisions ensure that agency action is the product of due process rather than arbitrary and uneven in its application, as well as in reviewable form for courts to enforce that due process. In the heavily referenced case of McDonald v. Department of Banking & Finance, 346 So. 2d 569 (Fla. 1st DCA 1977),[3] the First District Court of Appeal carefully articulated the principles that require agency action to be set aside when insufficiently explained:

Section 120.57 requires agency explanation of its discretionary action affecting a party's substantial interests, and Section 120.68 subjects that explanation to judicial review.

Section 120.57 proceedings, in which the agency's nonrule policy is fair game for a party's challenge both in the public and in his private interest, concludes [sic] by a final agency order which explicates "policy within the agency's exercise of delegated discretion," explains any deviation from "an agency rule, an officially

_____

3. Superseded on other grounds by statute, § 120.54(1)(a), Fla. Stat. (Supp. 1996), as recognized in Dep't. of Highway Safety & Motor Vehicles v. Schluter, 705 So. 2d 81 (Fla. 1st DCA 1997).

- 13 -

stated policy, or a prior agency practice," and, in a "licensing" proceeding such as this one, "state[s] with particularity the grounds or basis for the issuance or denial" of the license. Sections 120.57(1)(b) 9, 120.57(2)(a) 1 and 2, 120.60(2), 120.68.

Judicial review proceedings under Section 120.68 similarly press for crystalization [sic] of agency discretion. The court's responsibility is to allow the agency full statutory range for its putative expertise and specialized experience. But, to the extent that agency action depends on nonrule policy, Section 120.68 requires its exposition as a credential of that expertise and experience. [D]isplaced findings of [a] hearing officer . . . lessen in probative force as the "facts" blur into opinions and opinions into policies, and the Department's power to substitute findings based on record evidence correspondingly increases. But the Department's duty of exposition also increases. The final order must display the agency's rationale. It must address countervailing arguments developed in the record and urged by a hearing officer's recommended findings and conclusions or by a party's written challenge of agency rationale in informal proceedings, or by proposed findings submitted to the agency by a party. See also Reporter's Comments on Proposed Administrative Procedure Act, p. 20 (3/9/74):

> "Three due process checks to prevent arbitrary agency action are the requirements that reasons be stated for all action taken or omitted, that reasons be supported by 'the record', and that specific judicial review procedures allow the courts to remedy defects of substance."

Failure by the agency to expose and elucidate its reasons for discretionary action will, on judicial review, result in the relief authorized by Section 120.68(13): an order requiring or setting aside agency action, remanding the case for further proceedings or deciding the case, otherwise redressing the effects of official action wrongfully taken or withheld, or providing interlocutory relief.

McDonald, 346 So. 2d at 583-84 (footnote omitted) (citations omitted).

While the Commission correctly notes that <u>McDonald</u> is distinguishable because in that case there was an insufficiently explained deviation from a hearing officer's findings of fact, the overriding principles of <u>McDonald</u> cannot be disregarded on minute distinctions in the agency procedural posture. Indeed, the <u>McDonald</u> principles have been extended to other contexts.

For instance, OPC refers this Court to <u>Seminole Electric Cooperative, Inc. v. Department of Environmental Protection</u>, 985 So. 2d 615 (Fla. 5th DCA 2008), in which the Fifth District set aside agency action that disregarded a stipulated evidentiary record and proposed order with sparse explanation. Specifically, "the order did not acknowledge or mention the systematic analysis in DEP's Staff Analysis Report, the other agency reports, the PSC's Determination of Need, other portions of the extensive stipulated record, or the detailed findings of fact set forth in the statutorily authorized stipulated proposed final order." <u>Id.</u> at 621. In setting aside the order, the <u>Seminole Electric</u> court rearticulated the principles of general law that had been codified in a statute requiring compliance with stipulations in the Electrical Power Plant Siting Act context:

> As a general rule, and absent a showing of fraud, misrepresentation or mistake, stipulations are binding on the parties who enter them, including administrative agencies participating in administrative proceedings and the courts. <u>See, e.g.</u>, <u>Gunn Plumbing, Inc. v. Dania Bank</u>, 252 So. 2d 1, 4 (Fla. 1971); <u>McGoey v. State</u>, 736 So. 2d 31 (Fla. 3rd DCA 1999); <u>EGYB, Inc. v. First Union Nat'l Bank of Fla.</u>, 630 So. 2d 1216 (Fla. 5th DCA 1994); <u>Sunshine Utils. of Central Fla., Inc. v. Florida Public Serv. Comm'n</u>, 624 So. 2d 306,

- 15 -

310 (Fla. 1st DCA 1993); Sanders v. Bureau of Crimes Comp., 474 So. 2d 410, 411 (Fla. 5th DCA 1985); see also Doyle v. Dep't of Bus. Regulation, 794 So. 2d 686, 692 (Fla. 1st DCA 2001) (an agency's stipulation in an administrative proceeding cannot be "simply set aside as not supported by evidence" by the agency head in a final order). Consistent with this general law, the Siting Act now expressly authorizes the parties in a Siting Act case to proceed by stipulation when no issues are contested and requires the Secretary to "act upon . . . the stipulation of the parties . . . ."

Id. at 621-22 (quoting § 403.509(1)(a), Fla. Stat. (2006)).

Other contexts in which an agency has insufficiently addressed its action include orders ignoring precedent on point, binding letters resulting from informal proceedings, and deviations from recommended penalties. See, e.g., Nordheim v. Dep't of Envtl. Prot., 719 So. 2d 1212, 1214 (Fla. 3d DCA 1998) (holding that agency's failure to consider its own precedent was an abuse of agency discretion that was "inconsistent with officially stated agency policy or a prior agency practice," not explained by the agency, and in violation of section 120.68(6)(e)3., Florida Statutes); Gen. Dev. Corp. v. Div. of State Planning, 353 So. 2d 1199, 1210-11 (Fla. 1st DCA 1977) (extending McDonald rule to binding letters obtained after informal proceedings and remanding for further explanation of the agency's decision); see also, e.g., Cartaya v. Dep't of Bus. & Prof'l Reg., 919 So. 2d 611 (Fla. 3d DCA 2006) (remanding for further explanation the Real Estate Appraisal Board's acceptance of administrative law judge's findings of fact but rejection of

recommended penalty without any explanation as required by section 120.57(1)(l), Florida Statutes).

Applying those principles, we find first the Commission departed from the essential requirements of law here by acknowledging OPC's contention that the settlement agreement applied, but failing to address the terms of the settlement in its analysis. Specifically, in its final order the Commission recognized that OPC had raised the settlement agreement:

> However, OPC [and the other objecting parties] all take the position that the rate case stipulation and settlement agreement entered into between OPC and FPUC on August 29, 2014 and approved by this Commission in Order No. PSC-14-0517-S-EI, issued on September 29, 2014, prohibits the recovery of costs associated with the FPL interconnection through the fuel clause.

Order Below, No. PSC-15-0586-F0F-EI, at 11-12 (footnote omitted) (record citation omitted). The order then went on to quote the same paragraph of the settlement agreement upon which OPC bases its claim. See id. at 12.

However, despite introducing the settlement agreement issue, the order did not perform any analysis of the settlement agreement issue with regard to the transmission interconnection project. See generally id. at 12-16. Instead, the Commission skipped to the merits of the fuel clause recovery rather than addressing whether the specific terms of the settlement agreement precluded such a recovery. See id. at 15. Specifically, the order only analyzed the enhanced

- 17 -

reliability, enhanced negotiation posture, and effect of future, non-contemporaneous savings that would result.  See id.

Strangely, the Commission did analyze the settlement agreement in detail with regard to the separately requested consulting and legal fees that were expended in connection with the transmission interconnection project:

> OPC argued that the settlement agreement precludes FPUC from seeking recovery in the fuel clause of its legal and consulting fees as does Order No. 14546.  It is OPC's position that FPUC is barred from seeking recovery in the fuel clause for the cost of types or categories that have traditionally and historically been recovered through FPUC's base rates.  In addition, OPC argued that the base rate freeze provision in the settlement agreement also prohibits FPUC from recovering these costs through cost recovery clauses.

> OPC contended that consulting and legal generation-related costs have traditionally and historically been recovered through base rates for both FPUC and other electric utilities.  OPC acknowledged that FPUC was allowed recovery through the fuel clause of its legal and consulting fees associated with the issuance and evaluation of RFPs for purchased power agreements.  However, it is OPC's contention that generic legal and consulting activities have not been specifically identified and allowed to be recovered through the fuel clause.
> . . . .
> As the starting point of our analysis, we disagree with OPC that FPUC has not "traditionally and historically" recovered consulting and legal fees through the fuel clause.  In Docket Nos. 060001-EI, 070001-EI, 080001-EI, 090001-EI, 10001-EI, 110001-EI, 120001-EI, 130001-EI, and 140001-EI, legal and consulting fees associated with fuel-related work were included in FPUC's true-up filings which we approved without objection.  Further, in Order No. PSC-05-1252, we approved the recovery of fees for Christensen and Associates related to the preparation and evaluation of a RFP for purchased power for its Northwest Division.  In Order No. PSC-05-1252, we cited the fact that FPUC was a small, non-generating, investor-owned electric utility that

did not have the resources internally to prepare an RFP and evaluate responses. Because FPUC has "traditionally and historically" recovered these types of costs through the fuel clause, we find that the terms of the settlement agreement do not apply and do not prohibit recovery through the fuel clause at this time.

Id. at 13-14 (footnotes omitted). Thus, the Commission's consideration and specific discussion of the settlement agreement as applied to one set of costs but not the other major request is bewildering at best.

Having determined that the Commission failed to perform its duty to explain its reasoning, we reach a juncture at which we may remand the issue to the agency or simply resolve the entire matter. See § 120.68(6)(a), Fla. Stat. ("The court may: 1. Order agency action required by law; order agency exercise of discretion when required by law; set aside agency action; remand the case for further agency proceedings; or decide the rights, privileges, obligations, requirements, or procedures at issue between the parties; and 2. Order such ancillary relief as the court finds necessary to redress the effects of official action wrongfully taken or withheld."). Due to the pure legal questions presented, we elect to resolve this matter today.

We begin by recognizing that the term "fuel clause" is a misnomer because the fuel clause is not a particular provision, but rather "a regulatory tool designed to pass through to utility customers the costs associated with fuel purchases." In re Petition by Fla. Power & Light Co. to Recover Scherer Unit 4 Turbine Upgrade

Costs Through Envtl. Cost Recovery Clause or Fuel Cost Recovery Clause (Scherer Unit 4), No. PSC-11-0080-PAA-EI, at 6, 2011 WL 339538 (Fla. P.S.C. Jan. 31, 2011). Its purpose "is to prevent regulatory lag . . . [which] has historically been a problem for utilities because of the volatility of fuel costs." Id. As the Commission has further recognized, regulatory lag "is not as much of a problem, however, when expenses, such as capital improvements, and operations and management costs, can be planned for and included in base rate calculations." Id. (emphasis added). The dissent ignores this important aspect. Nevertheless, the Commission has on occasion allowed recovery of some capital type costs through the fuel clause. In 2011, the Commission issued Scherer Unit 4 in which it recounted the fuel clause's purpose and application with regard to capital costs:

> In 1985, we amended the fuel clause process to better describe those items that would be recoverable under the fuel clause. Prior to the August 1985 fuel hearing, we instructed the parties and our staff to "provide information necessary for the Commission to be able to consider at the August 1985 fuel adjustment hearing whether the utilities were passing appropriate fixed and variable costs associated with fuel receipts through their fuel adjustment clauses." Order No. 14546 approved a stipulation between OPC, FPL, TECO, Gulf, and FPC (now PEF) after a workshop exploring the issue. The policy outlined in Order No. 14546 consisted of two essential points regarding the scope and application of the fuel adjustment clause:
>
> > 1. When similar circumstances exist, the Commission should attempt to treat, for cost recovery purposes, specific types of fossil fuel-related expenses in a uniform manner among the various electric utilities. At times, however, it may be appropriate to treat similar types of expenses in dissimilar ways.

2. Prudently incurred fossil fuel-related expenses which are subject to volatile changes should be recovered through an electric utility's fuel adjustment clause. The volatility of fossil fuel-related costs may be due to a number of factors including, but not necessarily limited to: price, quantity, number of deliveries, and distance. Except as noted below, these volatile fossil fuel-related charges are incurred by the utility for goods obtained or services provided prior to the delivery of fuel to the electric utility's dedicated storage facilities. (Dedicated storage facilities mean storage facilities which are used solely to serve the affected electric utility.) All other fossil fuel-related costs should be recovered through base rates.

Order 14546 then discussed the parties' specific applications of the articulated policy, including, for example, the description of "invoiced fuel charges." It was determined that invoiced fuel charges should include all price revisions and adjustments relating to volume and quality of fuel. After discussing several specific applications of the policy, the parties agreed that our policy on fuel clause recovery should be flexible enough to cover some items that would normally go through base rates, and we approved that position. We discussed this fuel clause exception to base rate recovery as follows:

In addition to stipulating to the foregoing applications of policy, the parties also recommended to the Commission that the policy it adopts be flexible enough to allow for recovery through fuel adjustment clauses of expenses normally recovered through base rates when utilities are in a position to take advantage of a cost-effective transaction, the costs of which were not recognized or anticipated in the level of costs used to establish the utility's base rates. One example raised was the cost of an unanticipated short-term lease of a terminal to allow a utility to receive a shipment of low cost oil. The parties suggest that this flexibility is appropriate to encourage utilities to take advantage of short-term opportunities not reasonably anticipated or projected for base rate

recovery. In these instances, we will require that the affected utility shall bring the matter before the Commission at the first available fuel adjustment hearing and request cost recovery through the fuel adjustment clause on a case by case basis. The Commission shall rule on the appropriate method of cost recovery based upon the merits of each individual case.

In Order No. 14546 we approved the stipulation of the parties and adopted them as our own. We found that the stipulated provisions (including the fuel clause exception to base rate recovery), were an appropriate extension of the policy established by Order No. 6357. As a result of the policy determinations, we made two lists. One list included charges properly considered in the computation of the average inventory price of fuel. The other list contained items that were more appropriately considered in the determination of base rates. It should be noted that each item on the lists was a shortened reference to the detailed description of the types of costs discussed earlier in the Order.

. . . .

As Order No. 14546 states, recovery may be allowed for:

Fossil fuel-related costs normally recovered through base rates but which were not recognized or anticipated in the cost levels used to determine current base rates and which, if expended, will result in fuel savings to customers. Recovery of such costs should be made on a case by case basis after Commission approval.

We find that the appropriate interpretation of this section of Order No. 14546 is that capital projects eligible for cost recovery through the Fuel Clause should produce fuel savings based on lowering the delivered price of fossil fuel, or otherwise result in burning lower price fuel at the plant. We note that the order discusses a "cost effective transaction," and gives as an example, "the cost of an unanticipated short-term lease of a terminal, to allow a utility to receive a shipment of low cost oil." (Order No. 14546, p. 3) This example clearly connects fuel savings to a project that lowers the delivered price of fossil fuel (i.e., the input price). Similarly, in Order No. PSC-95-1089-FOF-EI, issued on September 5, 1995, we approved

> FPL's purchase of 462 high capacity aluminum rail cars for delivery of coal to Plant Scherer, a capital project that lowered the delivered price of fuel. The purchase of the rail cars enabled FPL to obtain favorable transportation rate savings from railroad companies that exceeded the recoverable cost of the purchase. That capital investment provided FPL customers an estimated $24 million in fuel savings, in the form of reduced fuel costs to FPL's customers, by lowering the delivered price, or input price, of coal.

Id. at 6-9 (footnotes omitted).

With the purpose of the fuel clause in mind, we conclude that the Commission erred as a matter of law in determining that the construction type costs associated with the actual construction of the physical structure for the transmission interconnection are recoverable through the fuel clause pursuant to Order No. 14546. Unlike the dissent, if we were to allow recovery of these capital construction costs through the fuel clause simply because they may result in savings and are loosely linked to fuel and purchased power through transmission lines, the fuel clause exception would finally totally swallow whole the rule that capital costs should be recovered through base rates because they can be subject to adequate planning.

Indeed, in this very case the testimony of FPUC witnesses suggested that FPUC simply chose to pursue recovery through the fuel clause as a matter of convenience, rather than any necessity borne of unforeseen volatility. Moreover, tellingly, FPUC had always recovered costs for transmission assets through base rates on prior occasions. Only after a settlement agreement freezing base rates was

in place did FPUC for the first time seek to recover transmission asset capital construction costs through the fuel clause.

We do not believe that the fuel clause is an end-all-be-all of cost recovery, but rather its history suggests its use should be limited to facilitating recovery of costs related to fuel and power purchases that are volatile, rendering them less than ideal for a base rates case. Today's case is certainly not the first example of utilities seeking to recover for items that are more properly base rate costs through the fuel clause in a practice that has become alarmingly frequent. Just recently we reexamined the contours of the fuel clause in reversing a commission order approving cost recovery of " 'exploration expense, depletion expense, operating expenses, G & A, taxes, transportation costs and a return on the unrecovered investment, including working capital' for investments in the exploration, drilling, and production of natural gas in the Woodford Shale Gas Region in Oklahoma." Citizens of State v. Graham, 191 So. 3d 897, 899 (Fla. 2016). The project was characterized as "a long-term physical hedge." Id. at 901. In that case we reaffirmed the purpose of the fuel clause as a mechanism for addressing the volatility of fuel prices between ratemaking proceedings:

> The fuel cost adjustment clause is a cash flow mechanism to allow utilities to recover costs for unanticipated changes in fuel costs between ratemaking proceedings. See Gulf Power Co.[ v. Fla. Pub. Serv. Comm'n, 487 So. 2d [1036, 1037 (Fla. 1986)] ("Fuel adjustment charges are authorized to compensate for utilities' fluctuating fuel expenses. The fuel adjustment proceeding is a continuous proceeding

and operates to a utility's benefit by eliminating regulatory lag."). The mechanism also permits utilities to recover actual costs of financial derivatives and physical hedges that help prevent price shocks from volatile fuel costs. However, regulated utilities through the fuel clause do not earn a return on money spent to purchase fuel. Likewise, while the costs of hedging contracts are pass-through costs, utilities through the fuel clause do not earn a return on the cost of hedging positions purchased.

Id. at 901. We rejected the "long-term physical hedge" characterization, concluding that the project was rather a "guaranteed capital investment," and therefore, rejected recovery through the fuel clause:

> Permitting advance recovery of FPL's investment in the Woodford Project's exploration and production of natural gas will not pay for the costs of actual fuel. It will provide recovery, instead, for investment, operation, and maintenance and operation of assets that will provide access to an unknown quantity of fuel in the future. It is impossible to know what the costs of the natural gas will be until it is actually produced. There is more uncertainty from this investment rather than less. Therefore, it cannot be characterized as a physical hedge.
> . . .
> The monies spent on the Woodford Project are not a mere pass-through, like other fuel expenses, because FPL will earn a return on its capital expenditures. Accordingly, the Woodford Project is a guaranteed capital investment for FPL; it is not a hedge to stabilize fuel costs.

Id. at 902. Ultimately, we concluded that recovery through the fuel clause was "overreach." Id. The dissent would reach back to invalidate this reasoning and overturn its substance.

Similarly, the Commission once approved recovery of security infrastructure costs through the fuel clause. However, recognizing its overreach, the

Commission correctly proceeded to repudiate that decision in <u>Scherer Unit 4</u>, a later fuel clause proceeding, noting that it was "a unique circumstance." <u>Scherer Unit 4</u>, No. PSC-11-0080-PAA-EI, at 9, 2011 WL 339538. The Commission went on to explain that "we believe the appropriate policy going forward is to restrict capital project cost recovery through the Fuel Clause to projects that are 'fossil fuel-related' and that lower the delivered price, or input price, of fossil fuel." <u>Id.</u> at 10. While that statement of the policy going forward in 2011 was a step in the right direction, this case and the hedging case both exemplify why the fuel clause proceedings must comport with serving their historical purpose of adjusting for <u>volatile</u> costs associated with fuel.[4] We cannot support the dissent's attempt to roll back the policy to that expressed in a 1974 order.

For this reason, we believe that the settlement agreement in this case, approved by the Commission and incorporated by reference, more precisely reflects the Commission's fuel policy with regard to the delineation of those capital

---

4. We also note that FPUC has referred us to the other fuel clause proceedings in which the Commission approved recovery of capital costs, such as the purchase of rail cars for the delivery of coal as noted above. While some of those circumstances may present close calls with regard to the appropriateness of recovery through fuel clause proceedings, certainly the costs associated with construction of brick and mortar facilities, installation of transmission lines, and other machinery intended to be used in perpetuity, all of which are subject to rigorous planning, present a decisively inappropriate basis for recovery of costs through fuel clause proceedings.

costs recoverable through base rates and those recoverable through fuel clause proceedings. The relevant provision of the settlement agreement provides:

VI. Other Cost Recovery

Nothing in this agreement shall preclude the Company from requesting the Commission to approve the recovery of costs that are: (a) of a type which traditionally and historically would be, have been, or are presently recovered through cost recovery clauses or surcharges, or (b) incremental costs not currently recovered in base rates which the Legislature or Commission determines are clause recoverable subsequent to the approval of this settlement. Except as provided in this Agreement, it is the intent of the Parties in this Paragraph VI that FPUC not be allowed to recover through cost recovery clauses increases in the magnitude of costs, incurred after implementation of the new base rates, of types or categories (including but not limited to, for example, investment in and maintenance of transmission assets) that have been traditionally and historically recovered through FPUC's base rates.

Thus, in accord with the historical purpose of the fuel clause proceedings, the plain language of the settlement agreement specifically prohibits FPUC from recovering through cost recovery clauses an increase in costs related to investments in transmission assets: "Except as provided in this Agreement, it is the intent of the Parties . . . that FPUC not be allowed to recover through cost recovery clauses increases in the magnitude of costs, incurred after implementation of the new base rates, of types or categories (including but not limited to, for example, investment in and maintenance of transmission assets) that have been traditionally and historically recovered through FPUC's base rates." (Emphasis added.) The evidence in the record plainly supports the notion that the costs at issue here are

"investment in . . . transmission assets" as the interrogatories and testimony of FPUC's witnesses demonstrate that the entire expense is related to construction of structures. Furthermore, although FPL is the entity constructing the structures, FPUC will be actually paying for and reimbursing FPL and retaining all ownership and responsibilities over the structures. FPUC's testimony further indicated that FPUC plans to recover future costs associated with this project through base rates. Consistent with that intention, an FPUC witness testified that FPUC does not currently recover its own transmission costs through the fuel clause. The dissent conflates the types and categories of costs with the amount of costs.

Moreover, the contrary understandings of the settlement agreement are not persuasive. First, FPUC contends that recovery of the transmission interconnection costs is authorized by the sentence immediately preceding the one prohibiting such a recovery. That sentence provides:

> Nothing in this agreement shall preclude the Company from requesting the Commission to approve the recovery of costs that are: (a) of a type which traditionally and historically would be, have been, or are presently recovered through cost recovery clauses or surcharges, or (b) incremental costs not currently recovered in base rates which the Legislature or Commission determines are clause recoverable subsequent to the approval of this settlement.

As previously explained, an FPUC witness testified that FPUC does not currently recover its own transmission costs through the fuel clause. Similarly, Commission

- 28 -

staff concluded in its memorandum that transmission interconnection costs are not historically or traditionally recovered through the fuel clause:

> First, the only transmission costs that FPUC has historically recovered through the fuel clause are those of JEA and Gulf Power embedded in its current wholesale power purchase agreements with both parties. None of FPUC's own transmission costs have ever been recovered through the fuel clause. Nor have any other [investor-owned utility] transmission costs been "historically" or "traditionally" recovered through the fuel clause. It should also be noted here that one of the benefits of the FPL interconnection testified to by witness Cutshaw is that the interconnection will significantly improve the reliability of service to Amelia Island. However, capital improvements to enhance service reliability have neither "historically" nor "traditionally" been recovered through the fuel clause.

(Record citations omitted.) Furthermore, the contention that the recovery sought is of the type historically and traditionally recovered through the fuel clause is belied by the Commission's own discussions of prior capital cost recoveries through the fuel clause as "case by case" and its subsequent labeling of that process as the "fuel clause <u>exception</u> to base rate recovery." <u>Scherer Unit 4</u>, No. PSC-11-0080-PAA-EI, at 7 (emphasis added). Indeed, the Commission in its brief indicates that this clause applies to expenses as a flexibility valve for costs "normally recovered through base rates." For the same reasons, we cannot agree that the costs at issue constitute "incremental costs not currently recovered in base rates."

Second, the Commission's contention that the settlement agreement no longer applies because FPUC's earnings fell below 9.25% also appears to be a

- 29 -

misreading of the settlement agreement's plain language.  This contention fails

because, as we have explained, the settlement agreement merely reflects the correct

application of the Commission's fuel clause policy.  Moreover, the contention

similarly fails as a matter of contract.  While it is true that the record indicates

FPUC's earned return on equity fell to 4.79%, the settlement agreement did not

necessarily become void upon that reduction in earnings, but merely allowed

FPUC to file a base rate case earlier than agreed upon by the parties to the

settlement:

> Notwithstanding Paragraph II-Return on Equity and Equity
> Ratio, the Parties agree that, in the event that [FPUC's] earned return
> on common equity falls below 9.25% during the Term on an FPUC
> earnings surveillance report stated on a thirteen-month average actual
> Commission adjusted basis, [FPUC] may file a Petition for Rate
> Increase with the Commission.

(Emphasis added.)  In this case, FPUC has not filed for a base rate increase, but has

instead pursued recovering the costs for the transmission interconnect through a

fuel clause proceeding.  The dissent would simply open the door to continuous

requests for additional money under the fuel adjustment clause.

Therefore, the contrary understandings of the settlement agreement's

language both lack persuasion and overlook the fact that the settlement agreement

merely rearticulates in a more accurate manner the existing Commission fuel clause policy.[5]

**CONCLUSION**

Therefore, ultimately, we reverse the order below on several grounds. First, we hold that the Commission departed from the essential requirements of law by failing to properly consider and address the settlement agreement with regard to FPUC's petition for the recovery of costs associated with the transmission interconnection project. Second, we hold that the Commission erred in concluding that such construction capital expenditures are capable of recovery through fuel clause proceedings. Finally, we hold that the settlement agreement did apply in this case and prohibited FPUC from petitioning the Commission for recovery of those costs through the fuel clause proceedings. We therefore reverse the order below and remand for the entry of an order dismissing and denying FPUC's petition for fuel adjustment recovery for the FPL transmission interconnection costs.

It is so ordered.

---

5. The Commission also contended that the settlement agreement could not be raised in this case because it provides that "[t]he Parties further agree that this Agreement shall have no precedential value in any proceeding before the Commission nor shall any Party assert same." However, as discussed above, in relevant part the settlement agreement did nothing more than rearticulate existing fuel policy concerning recovery of capital costs.

LABARGA, C.J., and PARIENTE, and QUINCE, JJ., concur.
POLSTON, J., concurs in result.
CANADY, J., dissents with an opinion.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.

CANADY, J., dissenting.

Because I disagree with the majority's interpretation of the settlement

agreement as prohibiting FPUC from recovering the costs of the FPL

interconnection through the fuel clause, and I would conclude that competent,

substantial evidence supports the Commission's determination that the costs of the

FPL interconnection may be recovered through the fuel clause, I dissent.

The settlement agreement entered into by FPUC and OPC, and approved by

the Commission, provides, in pertinent part:

> Except as provided in this Agreement, it is the intent of the Parties . . .
> that FPUC not be allowed to recover through cost recovery clauses
> increases in the magnitude of costs, incurred after implementation of
> the new base rates, of types or categories (including but not limited to,
> for example, investment in and maintenance of transmission assets)
> that have been traditionally and historically recovered through
> FPUC's base rates.

In re Fuel & Purchased Power Cost Recovery Clause with Generating Performance

Incentive Factor, Order No. PSC-15-0586-FOF-EI at 12, 2015 WL 9450334 (Fla.

P.S.C. Dec. 23, 2015).  The majority incorrectly concludes that this language

"specifically prohibits FPUC from recovering through cost recovery clauses an

- 32 -

increase in costs related to investments in transmission assets," such as the FPL interconnection. Majority op. at 27.

The majority erroneously reads the phrase "increases in the magnitude of costs" to mean "additional costs." Contrary to the majority's interpretation, the plain language of the agreement does not prohibit the recovery of "an increase in costs related to investments in transmission assets." Instead, the agreement prohibits "increases in the <u>magnitude of costs</u>"—that is, an increase in the amount of those costs already existing at the time the settlement agreement was adopted. Thus, while the agreement prohibits cost recovery through the fuel clause for increases in the magnitude of costs that are already being recovered through FPUC's base rates—such as enhancement, modification, or maintenance of transmission assets accounted for in the base rates—it does not prohibit cost recovery through the fuel clause of entirely new costs related to investments in transmission assets, such as the FPL interconnection. Since the costs of the FPL interconnection are not included in FPUC's base rates, these costs do not constitute an "increase in the magnitude of costs" for an asset already being recovered through base rates but rather an entirely new cost. We must avoid an interpretation of the agreement that would render the words "magnitude of" superfluous. <u>See Equity Lifestyle Props., Inc. v. Fla. Mowing and Landscape Serv., Inc.</u>, 556 F.3d 1232, 1242 (11th Cir. 2009) ("We must read the contract to give meaning to each

and every word it contains, and we avoid treating a word as redundant or mere surplusage 'if any meaning, reasonable and consistent with other parts, can be given to it.' " (quoting Roberts v. Sarros, 920 So. 2d 193, 196 (Fla. 2d DCA 2006)) (applying Florida law).

I also disagree with the majority's conclusion "that the Commission erred as a matter of law in determining that the construction type costs associated with the actual construction of the physical structure for the [FPL] interconnection are recoverable through the fuel clause pursuant to Order No. 14546." Majority op. at 23. The Commission allows for purchased-power costs to be recovered through the fuel clause based upon its finding that "[p]urchased power is nothing more than a substitute for power generated." In re Gen. Investigation of Fuel Adjustment Clauses of Elec. Cos., Order No. 6357 at 7, 1974 WL 331861 (Fla. P.S.C. Nov. 26, 1974).

In Order No. 14546, the Commission stated that its policy for allowing cost recovery through the fuel clause should

> be flexible enough to allow for recovery through fuel adjustment clauses of expenses normally recovered through base rates when utilities are in a position to take advantage of a cost-effective transaction, the costs of which were not recognized or anticipated in the level of costs used to establish the utility's base rates.

In re Cost Recovery Methods for Fuel-Related Expenses, Order No. 14546, 85 F.P.S.C. 7:67, 7:69, 1985 WL 1090146 (Fla. P.S.C. July 8, 1985). Also in Order

No. 14546, the Commission enumerated ten fuel-related cost items that are properly considered for recovery through the fuel clause, the tenth of which applies to the costs of the FPL interconnection:

> 10. Fossil fuel-related costs normally recovered through base rates but which were not recognized or anticipated in the cost levels used to determine current base rates and which, if expended, will result in fuel savings to customers. Recovery of such costs should be made on a case by case basis after Commission approval.

Id. at 7:71. The Commission has since identified this tenth enumerated fuel-related cost item as the "fuel clause exception to base rate recovery." In re Petition by Fla. Power & Light Co. to Recover Scherer Unit 4 Turbine Upgrade Costs Through Envtl. Cost Recovery Clause or Fuel Cost Recovery Clause, Order No. PSC-11-0080-PAA-EI at 7, 2011 WL 339538 (Fla. P.S.C. Jan. 31, 2011).

In the order on appeal, the Commission cited to previous orders in which it applied the "fuel clause exception to base rate recovery" to various proposed base rate capital costs for which recovery through the fuel clause was requested. In re Fuel & Purchased Power Cost Recovery Clause with Generating Performance Incentive Factor, Order No. PSC-15-0586-FOF-EI at 11 & n.11, 2015 WL 9450334 (Fla. P.S.C. Dec. 23, 2015); id. at 11 n.11 (citing, e.g., In re Petition to Recover Capital Costs of Polk Fuel Cost Reduction Project Through the Fuel Cost Recovery Clause, by Tampa Elec. Co., Order No. PSC-12-0498-PAA-EI, 2012 WL 4482022 (Fla. P.S.C. Sept. 27, 2012) (granting in part and denying in part

recovery through the fuel clause of certain capital project costs to convert a power plant from oil- and propane-fired to natural gas upon finding that the project will produce fuel savings by burning a lower priced fossil fuel); In re Petition for Prudence Determination Regarding New Pipeline Sys. by Fla. Power & Light Co., Order No. PSC-13-0505-PAA-EI, 2013 WL 5870547 (Fla. P.S.C. Oct. 28, 2013) (approving recovery through the fuel clause of certain long-term transportation contracts for the delivery of natural gas through a new pipeline system upon finding that the contracts were projected to save up to $450 million over the term of the contracts when compared to the next most cost-effective proposal)).

Further, the Commission received evidence establishing that the FPL interconnection will directly benefit FPUC's customers by providing an estimated $2.3 million in savings in future purchased-power costs and that the costs associated with the FPL interconnection project were not anticipated and have not been recovered in FPUC's base rates. Thus, the Commission did not err as a matter of law in allowing FPUC to recover the costs of the FPL interconnection through the fuel clause, and there is competent, substantial evidence in the record to support the Commission's determination that allowing cost recovery for the interconnection through the fuel clause comports with the Commission's existing policy under the "fuel clause exception to base rate recovery." I therefore would affirm the Commission's order.

An Appeal from the Florida Public Service Commission

J.R. Kelly, Public Counsel, Charles J. Rehwinkel, Deputy Public Counsel, Patricia A. Christensen, Associate Public Counsel, and Stephanie A. Morse, Associate Public Counsel, Office of Public Counsel, Tallahassee, Florida,

for Appellant

Keith C. Hetrick, General Counsel, Samantha M. Cibula, Attorney Supervisor, and Rosanne Gervasi, Senior Attorney, Florida Public Service Commission, Tallahassee, Florida,

for Appellee Florida Public Service Commission

Kenneth B. Bell, Mary E. Keating, and Lauren V. Purdy of Gunster, Yoakley & Stewart, P.A., Tallahassee, Florida,

for Appellee Florida Public Utilities Company